RALSTON PURINA COMPANY,
Plaintiff-Appellee,

v.

Joe B. HOBSON, Defendant-Appellant.

No. 75–4246.

United States Court of Appeals,
Fifth Circuit.

June 23, 1977.

Billy L. Church, Pell City, Ala., James M. Fullan, Jr., Birmingham, Ala., for defendant-appellant.

Richard F. Ogle, Birmingham, Ala., for plaintiff-appellee.

Before WISDOM and GEE, Circuit Judges, and BOOTLE,* District Judge.

GEE, Circuit Judge:

In September 1973, the Ralston Purina Company agreed to furnish Joe Hobson sufficient feed to raise 40,000 chickens for 26 weeks. Hobson agreed to pay for this feed upon sale of the chickens but no later than March 26, 1974. On October 31, 1973, the parties signed two written statements confirming the earlier oral agreement, but the two documents contained contradictory terms. Purina's Pullet Finance Contract limited Hobson's credit to $1.65 per bird, or a total of $66,000 for 40,000 chickens. Attached to the contract was a cover letter addressed to Hobson:

This letter will confirm to you that the following lines of credit have been established for your use out of the Guntersville, Alabama mill:

| Terms | Line |
|---|---|
| Pullet Feeder Finance | $34,000. |

The letter closed with this instruction: "to signify your understanding of the above

* Senior District Judge of the Middle District of Georgia, sitting by designation.

terms, please sign your name on the line provided and return the original to us." Joe Hobson signed.

On January 29, 1974, Purina terminated the contract because Hobson had run up a debt of $46,391.28, exceeding his $34,000 line of credit. Hobson protested that the contract granted him a $66,000 limit on credit. Eight days later, Hobson secured a new source of feed for his chickens but claimed to have lost 18,000 birds in the interim owing to starvation-related causes. Hobson refused to pay anything, causing Purina to sue for the $46,391.28 past due. Hobson counterclaimed for damages resulting from Purina's breach of the contract and for fraud, alleging that Purina never intended to extend credit in the amount of $1.65 per bird despite its Pullet Finance Contract containing those terms. The trial court directed a verdict in favor of Purina for the $46,391.28 and directed a verdict against Hobson on the fraud count. The counterclaim for damages resulting from Purina's breach was sent to the jury, which awarded Hobson $27,455 in damages. The trial court then granted Purina's motion for judgment n.o.v., finding that Hobson had failed to sustain his burden of proof that Purina's failure to supply feed was the proximate cause of the deaths of the chickens. Hobson's motion for a new trial on damages alone was denied. On appeal Hobson complains that under the *Boeing Co. v. Shipman* [1] test there was sufficient evidence to create a jury question that lack of feed caused his high rate of chicken mortality making it error to reverse the jury's award of damages. He also complains that it was error to direct a verdict in favor of Purina for $46,391.28 because the jury found that Purina breached the contract and the defaulting party ought not be allowed to recover on the contract. Finally, Hobson complains that there was sufficient evidence of fraud in the inception on Purina's part to send that claim to the jury.

■ Appellant strenuously argues that under Alabama law he is excused from pay-ing the $46,391.28 due for feed previously delivered because Purina, by terminating the delivery of feed early, breached the contract. To agree with appellant this court would have to ignore § 2–607(1) of the Uniform Commercial Code as enacted in Alabama: "The buyer must pay at the contract rate for any goods accepted." Ala. Code tit. 7A § 2–607(1). In *United States v. Crawford,* 443 F.2d 611 (5th Cir. 1971), we interpreted this section of the UCC to require the granting of a judgment notwithstanding the verdict where there was no conflict in the evidence as to the amount due on the contract for goods accepted. The trial court properly granted Purina's motion for a directed verdict as to the $46,391.28 owed by Hobson for feed accepted under the contract.

■ We also sustain the directed verdict against Hobson on his fraud counterclaim. At all times Purina insisted that the contract figure extending credit of $1.65 per bird was a typographical error, and the record does not contradict this claim of clerical mistake. There is simply no evidence that Purina entered into the Pullet Finance Contract intending to deceive Hobson as to the amount of credit that would be extended. Moreover, it seems plain that a party seeking deceptively to limit credit to less than $1.65 per bird would not have set forth the $34,000 line of credit explicitly, as did Purina in the cover letter accompanying the contract.

■ To determine the final issue on appeal, whether it was error to grant the judgment n.o.v., we must enter the murky waters of measuring what is "substantial evidence" sufficient to create a jury question. In diversity cases the test to be applied is the federal standard expounded in *Boeing Co. v. Shipman:* "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions". *Supra* at 374. The court must consider all the evidence before declaring it substantial or insubstantial. We are here

1. *Boeing Company v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc).

concerned with whether or not there is any substantial evidence that Purina's withdrawal of feed *caused* Hobson's chickens to suffer a high mortality rate in the eight-day period before new feed was obtained.

On January 29, 1974, Purina delivered 16,000 pounds of chicken feed to Hobson. Experts testified that this would feed Hobson's 40,000 birds for three or three-and-one-half days, so that February 2 should have been the first full day that the chickens were without food. Hobson testified that on February 6 he began to lose large numbers of chickens daily, his overall loss totalling 18,000 birds before new feed was procured on February 8. Hobson theorized that his chickens died from three starvation-related causes: (1) Starvation incited cannibalism by pecking; (2) starvation lowered the birds' body temperatures and induced "piling" to keep warm, a phenomenon which resulted in death by smothering to large numbers of his flock; and (3) the stampede to get to the new feed when it was finally reintroduced killed hundreds of birds. Hobson introduced no evidence to support his assertions except his own mortality charts. Purina introduced two poultry nutritionists as expert witnesses.[2] Both experts testified that chickens of this age could easily live for two weeks without food as long as they had access to water, which Hobson's chickens did. They further testified that it was common practice in the poultry industry to withdraw feed from chickens of this size for five to ten days to induce molting. They concluded that it was "out of the question" that six days without feed would produce 18,000 deaths in a flock of 40,000 birds.

Next, the expert witnesses discussed the pecking problem described by Hobson as one cause of his high mortality rate. The self-employed nutritionist testified that a pecking problem cannot be correlated with hunger and that introducing feed will not stop pecking. The only solution to a pecking problem is to debeak the birds. Hobson had incurred a pecking problem earlier when his chickens had ample feed; he solved the problem by debeaking his birds. Beaks grow back and, according to the nutritionist, the solution to Hobson's pecking problem in early February would have been to debeak his birds a second time.

The two nutritionists undermined Hobson's theory that piling was a significant cause of death among his flock. Both described piling as a phenomenon characteristic of young birds under ten weeks of age. One described it as extremely rare for 19-week-old birds, fully feathered and approaching mature body weight, to pile. The other testified that given pullets of 19 weeks of age, lack of feed would not cause any significant piling in a properly regulated chicken house unless the temperature dropped down around zero.

Finally, as to the rush to get new feed, both experts testified that such stampeding was common among chickens. New feed was delivered to Hobson's chickens on February 8, which should reflect a peak mortality from the stampeding. But Hobson's own mortality charts belie a high incidence of death from stampeding:

February 5—826 birds lost
February 6—744 birds lost
February 7—683 birds lost
February 8—655 birds lost.

Both experts testified that these figures did not support the theory that the rush to new food resulted in heavy losses to Hobson's flock.

In the face of this uncontradicted expert testimony, does Hobson's self-serving testimony qualify as substantial evidence to support the jury's award of damages caused by Purina's breach? We agree with the trial court that it does not. We begin by crediting the trial judge's evaluation of the evidence. "Great weight is due to the ruling of a trial court setting aside a verdict as contrary to the evidence". 5A C.J.S. *Appeal & Error* § 1673 at 658 (1958). Under *Boeing Co. v. Shipman*, we must not weigh the credibility of the witnesses, including Hobson's testimony explaining the cause of his losses. But completely self-

---

**2.** One nutritionist was employed by Purina; the other was self-employed.

serving testimony, unsupported by other evidence and in the teeth of universal experience, will not support a jury verdict. In *United States v. Generes,* the Supreme Court agreed with Judge Simpson's view that judgment n.o.v. for the government was proper when merely self-serving testimony supported a taxpayer's claim that a bad debt was business-related:

> The bare self-serving statements of Taxpayer were the sole evidence offered by him as to his motivation. If the dominant motivation criterion had been applied, I do not think these statements would have been sufficient under *Boeing Company v. Shipman* standards of proof, to take the case to the jury in the face of clear proof that Generes and Kelly were required to sign the endorsement in order for the corporation to engage in the construction business.

427 F.2d 279, 284–85 (5th Cir. 1970) (Simpson, J., dissenting), *rev'd,* 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972). Our court has recently affirmed this view that self-serving statements alone do not create a jury question:

> In our opinion, the isolated self-serving statements of the Cal-Florida officers were not enough to constitute substantial evidence for the jury on the causation issue under *Boeing Co. v. Shipman.*

*Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1371 (5th Cir. 1976). A trier of facts need not ignore powerful self-interest,[3] and where there is no relevant support for self-interested testimony a jury must not be allowed to speculate as to causation.[4] A directed verdict, or judgment notwithstanding the verdict, is the proper

safeguard against such speculation by the jury:

> With only his *ipse dixit* to establish the fact of damage, Shumate would have this Court find his testimonial speculation and contentions supply the basis for a jury issue as to the fact of damage. But more evidence than this is necessary to demonstrate that there has been injury before the jury can be allowed to consider the amount that would properly compensate him for such injury.

*Shumate & Co., Inc. v. National Association of Securities Dealers, Inc.,* 509 F.2d 147 (5th Cir. 1975).

Not only was Hobson's theory of what caused his losses unsupported by other evidence, it was thoroughly discredited by the testimony of both expert poultry nutritionists. What Hobson says his chickens did, chickens do not do. Evidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict. *Holland v. Allied Structural Steel Co., Inc.,* 539 F.2d 476 (5th Cir. 1976), *citing Southern Pacific Co. v. Matthews,* 335 F.2d 924, 927 (5th Cir. 1964). *See also Zollman v. Symington Wayne Corp.,* 438 F.2d 28 (7th Cir. 1971); *Atlantic Coast Line R.R. v. Collins,* 235 F.2d 805 (4th Cir. 1956); *Galloway v. United States,* 130 F.2d 467 (9th Cir. 1942); *Humble Oil & Refining Co. v. Martin,* 144 Tex. 175, 222 S.W.2d 995 (1949). We find that the trial court properly could have disregarded Hobson's testimony as evidence at variance with the established nature of chicken behavior and the physical characteristics of chickens as described by the undisputed testimony of the experts.[5] Be-

---

3. *Falk v. C.I.R.,* 332 F.2d 922 (5th Cir. 1964).

4. Less speculation is permissible in considering the causation or fact of damage than in ascertaining the amount of damages. *Helene Curtis Industries, Inc. v. Pruitt,* 385 F.2d 841 (5th Cir. 1967), *citing Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

5. The trial court's estimate of Hobson's testimony could have been lowered further by the evidence challenging the size of his alleged losses. After the loss of 18,000 chickens in the

first week of February, Hobson's flock would have numbered some 20,000 birds. Yet in the third week of February he applied to his new supplier for credit to feed 36,000 chickens. The poultry nutritionists testified unequivocally that the amount of feed delivered to Hobson between February and July 1974 could not have been consumed by 22,000 birds; they calculated that Hobson was feeding more than 30,000 birds during this period. Finally, there was evidence that after his presumed losses Hobson advertized that he had 36,000 chickens to sell.

cause there is no other evidence of causation, it then became his duty to grant the judgment notwithstanding the verdict.

We do not lightly set aside jury verdicts. But our reading of the record supports the trial judge's evaluation that appellant did not sustain his burden of proof that Purina's breach caused his epidemic losses.

AFFIRMED.