Edward R. DALTON

v.

**TULANE TOYOTA, INC. and the Toyota Motor Sales, Inc.**

Civ. A. No. 79–3463.

United States District Court, E. D. Louisiana.

Nov. 24, 1981.

Henry L. Klein, Klein & Rouse, New Orleans, La., for plaintiff.

Jerry L. Saporito, Bernard, Cassisa, Babst & Saporito, Metairie, La., for defendants.

## MEMORANDUM AND ORDER

JACK M. GORDON, District Judge.

The motion presently before the Court arises from the litigation of Mr. Edward R. Dalton's products liability claim against Toyota Motor Sales, U.S.A., Inc. (hereinafter "Toyota"). Plaintiff Dalton contended that his Toyota vehicle was defective in its design—these deficiencies allegedly causing injury to his person. A jury trial of this matter commenced on March 19, 1981 and was completed on March 20, 1981. Defendant Toyota moved for involuntary dismissal at the close of the plaintiff's case, and re-urged a directed verdict motion at the completion of all evidence. Supportive of its motions, Toyota argued that there was no evidence of the alleged defects nor of the requisite causal connection between a

defect, assuming, *arguendo*, its existence, and the plaintiff's injuries.

When confronted with the Rule 41(b) motion at the close of plaintiff's evidence, the Court expressed to counsel its tentative view that there was no evidence to support the proposition that the Toyota automobile in question was defectively designed. More specifically the Court indicated to counsel its view that a finder of fact could only speculate concerning the appropriate warning to be given a consumer concerning catalytic converters, even if the finder of fact were to conclude that the accidents in question were caused by the catalytic converter. The Court thus invited counsel to attempt to find authority to guide the Court in such' a situation where there was no expert or other evidence pertaining to appropriate standards of warning, or to support the proposition that the "warning" in evidence relating to the automobile in question was insufficient. The Court allowed a recess to give counsel time for research to be conducted and after this recess counsel for plaintiff submitted to the Court the case of *Stapleton v. Kawasaki Heavy Industries, Ltd.*, 608 F.2d 571 (5th Cir. 1979). Although entertaining the same concerns and questioning whether the language in the *Stapleton* case applied, the Court, in order to allow the case to proceed, reserved ruling on the motion and ultimately sent the case to the jury with such reserved rulings.

The jury returned a $250,000.00 verdict for the plaintiff. Thereafter, Toyota brought the instant motion for judgment notwithstanding the verdict, and, alternatively, for a new trial. The passage of time affording an opportunity for examination of the *Stapleton* case, the Court, still mindful of its prior hesitations, now understands that *Stapleton* cannot accomplish its asserted purpose. As the motion for directed verdict should have been granted, the Court now GRANTS Toyota's motion for judgment notwithstanding the verdict, and, alternatively, for a new trial.

The following narrative presents the factual situation on which the plaintiff based his cause of action. After leaving an office Christmas party on December 24, 1978, Mr. Dalton was driving his Toyota Corolla vehicle from Mobile, Alabama, to New Orleans, Louisiana, proceeding west on Interstate Highway 10. The plaintiff remembered no facts concerning the events leading up to and occurring during the accident; he did inform the individual who rescued him that he had steered the vehicle off the road, lit a cigarette, and fallen asleep. While Mr. Dalton napped, the vehicle burst into flames and he suffered severe burns over his body. Mississippi State Highway Patrolman Curtis Newman investigated the December 24, 1978 accident. His investigative report revealed that the Dalton vehicle was found on the center median of Interstate Highway 10 pointed in an easterly direction. The plaintiff could offer no explanation for the fact that the vehicle was pointed east when he had been proceeding west.

Mr. Dalton contended that an improperly designed catalytic converter caused the fire. The plaintiff further claimed that the Toyota owner's manual contained insufficient warnings relative to dangers encountered when parking the vehicle over combustible materials.

The plaintiff presented no evidence supportive of the contentions relative to the design of the catalytic converter. That is, the Court heard no testimony concerning industry standards, tests, or other objective evaluations of the operation of a catalytic converter. Mr. George Pappas, testifying at the plaintiff's behest, did not qualify as an expert witness in the field of catalytic converter design. Rather, as a qualified expert in the field of engineering and fire investigation, Mr. Pappas concluded that the skin temperature of the catalytic converter was approximately 1800 degrees Fahrenheit. He concluded that the fire did not originate from within the vehicle. Plaintiff's challenge to the design of the catalytic converter of the Toyota vehicle had been virtually abandoned by the close of the trial; the primary issue remaining being the adequacy of the warning.

Page one of the owner's manual prominently displays a provision cautioning the

consumer against parking the vehicle over dry grass or over any material easily flammable.[1] Mr. Dalton testified that he had not read the manual, though he did receive a copy of the manual upon acquisition of the vehicle.

The plaintiff introduced no evidence relating to industry standards of adequate warnings. No guidelines were presented indicative of a more effective warning—either hypothetical or actually utilized. The plaintiff did introduce evidence of an indicator light utilized by another manufacturer and similar to a device appearing on the dashboard of some prior Toyota models. No connexity was established, however, between the above-described device and its usage as a possible precaution on the Toyota vehicle driven by Mr. Dalton. With no such relevance or significance attached to this evidence, the jury could still only speculate as to an appropriate standard. Neither was there evidentiary development tending towards proof of the inadequacy or inconspicuousness of the operative warning. In essence, the plaintiff left a cloud of uncertainty over the courtroom by his failure to define the term "adequate;" resolution of the case thus calling for conjecture. While apparently challenging the sufficiency of a printed warning in the owner's manual, intended to guard against precisely the incident that did occur, the plaintiff made no affirmative showing of an alternative warning that might have prevented the fire.

The immediate result and the future implications of a case adjudicated upon such slight evidentiary presentation should represent sources of consternation to any court. Should the pivotal question posed by a lawsuit be reduced to a relative standard—one dependent upon individual savvy? With no expert opinion to guide the resolution, could Mr. Dalton's circumstances provide an authoritative basis on which to adjudicate a question of substantial import within the automobile industry? Affirmative answers to these questions yield precarious consequences when cognizant of the operative facts: Mr. Dalton had been napping, had lit a cigarette, and had failed to read the owner's manual. Moreover, questions remain regarding the origin of the fire as being within or without the vehicle.

In this action predicated upon diversity of citizenship, 28 U.S.C. § 1332, the Court shall apply provisions of Louisiana law governing products liability. *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Controlling authority mandates that in order to prevail on a damage claim for injuries arising from a defective product, the plaintiff bears the burden of proving both that the product was defective and that the injuries were caused by the defect. *Soileau v. Ford Motor Company*, 639 F.2d 214 (5th Cir. 1981).

While continually denying the existence of a defective condition resulting either from the catalytic converter or from a failure to warn, Toyota argues that the plaintiff has not met his burden of proving causation. That is, the defendant contends that the deficient proof on the alleged defects has not, nor could not, serve to establish the requisite causal relationship. The plaintiff presented claims of a defective vehicle and evidence of the circumstances surrounding a fire in the Toyota vehicle. Liability imposition on Toyota based upon a fire of questionable origin when there has

---

1. The owner's manual states on page one:

   The catalytic converter is an emission control device installed in the exhaust system. It is installed only on Corolla's sold in the U.S.A. The catalytic converter looks somewhat like a muffler, but it performs an important job in maintaining cleaner air.

   If a large amount of unburned gasoline flows into the converter, it may overheat and create a fire hazard. To prevent this, observe the following precautions:

   Do not drive with an extremely low fuel level. This may cause engine misfire which creates an extra load for the converter.

   Do not allow the engine to run at fast idle speed for more than ten minutes or at normal idle speed for more than twenty minutes.

   *Do not park the car over dry grass or over anything that might burn easily.*

   Do not turn off the ignition while the car is moving. (emphasis added)

been scant evidence on the existence of a defective catalytic converter or of the inadequacy of the warning provides a tenuous thread by which the alleged defects can be definitively linked to the fire and, thus, to the plaintiff's injuries. Such a result would seem to belie the legal fundamentals of a products liability cause of action. Moreover, had there been a glaring warning directed at Mr. Dalton, could any such more conspicuous measure have cautioned the sleeping plaintiff of impending danger and thus have avoided the accident?

The case of *Stapleton v. Kawasaki Heavy Industries, Ltd., supra,* while providing authority for jury submission on the warning issue, involved principles differing from those operative in the instant case. In *Stapleton,* the plaintiff brought a products liability action against a motorcycle manufacturer and distributor for fire damage to his home. The plaintiff's son had inadvertently tipped over the Kawasaki motorcycle that he was cleaning in the basement of the home. As the fuel switch had remained in the "on" position, gasoline leaked from the fuel tank. The gasoline being ignited by the heater pilot light, a fire ensued. The plaintiff alleged negligence, strict liability for selling a defective motorcycle, and breach of a duty to warn about the dangerous nature of the fuel switch on the motorcycle. Pertinent to Mr. Dalton's case are the negligence contentions based not on the presence of a defect but on the failure to warn of an "unsafe design feature." Under the controlling Georgia authority, the failure to warn could suffice to impose liability on Kawasaki under both negligence and strict liability theories. The jury in *Stapleton* could thus consider either theory as a basis for liability. Herein lies the point at which the two cases begin to diverge, *Stapleton* assuming an inapposite posture to the case at bar. The clarity of the Louisiana law shines in a differing direction, as Mr. Dalton's case involved no negligence claims but hinged solely on the appropriate strict liability theories. The Louisiana adaptation of strict liability is grounded upon civil law concepts of fault, without being circumscribed by impositions of negligence or personal culpability upon manufacturers. *Soileau v. Nicklos Drilling Company,* 302 F.Supp. 119 (W.D.La.1969). This Court refused to submit an issue of negligence to the jury.

■. Through its interrogatory response, the jury in *Stapleton* found that the defendant had failed to adequately warn in the owner's manual that the fuel switch left in the "on" position would allow spillage from the gasoline tank. The affirmative response was not necessarily premised on an initial finding of defectiveness, the jury having declined to make such a finding in a previous interrogatory. Under the relied-upon Georgia authority, there was no requirement that a design defect be found as a predicate to determining the warning to be inadequate. Citing the pertinent judicial precedent, the court remarked in a footnote that an instruction to the contrary, i. e., necessitating a finding of design defect, would be erroneous owing to the dual liability basis—negligence and strict liability—for selling an otherwise non-defective product without adequate warning. Thus, the Louisiana and Georgia species of products liability differ fundamentally. In Louisiana, the manufacturer's instructions and warnings regarding the operating capabilities and limitations of its products factor significantly in the over-all design of the product. *LeBouef v. Goodyear Tire & Rubber Company, et al.,* 451 F.Supp. 253 (W.D. La.1978), *aff'd.* 623 F.2d 985 (5th Cir. 1980). The manufacturer, then, must fulfill his duty to adequately warn of any unreasonable danger posed by the normal use of its product, where the manufacturer knows or should know of such danger. *Cobb v. Insured Lloyds, et al.,* 387 So.2d 13 (La.App. 1980).[2]

2. On this element, the Court instructed the jury:

The instructions and warnings given by a manufacturer with respect to the operating ca-

pabilities and limitations of its products are a significant part of the over-all design of the product. Therefore, a product whose design would otherwise be reasonably safe, may be

The Fifth Circuit in *Stapleton* stated that "[w]hether adequate efforts were made to communicate a warning to the ultimate user are uniformly held questions for the jury," 608 F.2d at 573, citing *West v. Broderick and Bascom Rope Co.*, 197 N.W.2d 202 (Iowa 1972); *Hubbard-Hall Chemical Co. v. Silverman*, 340 F.2d 402 (1st Cir. 1965).[3]

In *Stapleton*, the plaintiff's son had testified that he " 'looked through the manual,' " without " 'really reading it.' " The court stated that the jury could find a sufficiently great danger of gas leakage to warrant a warning "presented in a way immediately obvious to even a casual reader." 608 F.2d at 571. The foregoing statement was footnoted with the following remark:

> Whether a warning adequately makes a user aware of the danger and its severity " 'depends upon the language used and the impression that it is calculated to make upon the mind of an average user of the product' " and involves " '[q]uestions of display, syntax and emphasis.' " *D'Arienzo v. Clairol, Inc.*, 125 N.J.Super. 224, 230–31, 310 A.2d 106, 112 (1973).

> Even if contributory negligence were a bar it would only bar recovery for negli-

gence. On the strict liability claim it would raise a jury question as to the adequacy of the warning. See *Parzini v. Center Chemical Co.*, 129 Ga.App. 868, 201 S.E.2d 809 (1973), *after trial*, 134 Ga. App. 414, 214 S.E.2d 700 (1975), *rev'd.* 234 Ga. 868, 218 S.E.2d 580 (1975), *on remand*, 136 Ga.App. 396, 221 S.E.2d 475 (1975). The manufacturer was held liable on both theories, the distributor only for negligence. 608 F.2d at 573, n. 4.

It must be pointed out that the above-cited cases represent adjudications of, respectively, New Jersey and Georgia law. This Court can find no meritorious basis in such authority on which to substantiate maintaining the jury verdict in Mr. Dalton's favor. The interests of justice would certainly best be served by review of the instant case untainted by statements and holdings of cases applying differing legal standards to their peculiar factual situations. The risk of language taken out of context from such adjudications seemingly warrants particular caution.

On a more fundamental basis, the Court finds cause for concern in its evaluation of the rectitude of submitting to a jury a determinative question when there has been

rendered unreasonably dangerous by a failure of the manufacturer to warn the buyer of any non-obvious dangers inherent in the particular design. However, a manufacturer has no duty to warn either the buyer or the ultimate user of a product of dangers which are either open and obvious, or of which a person with the buyer's or user's knowledge and experience should be aware.

So you must determine whether the defendant has satisfied its duty to give instructions as to the use of the product. When a manufacturer undertakes to give printed instructions, it has the duty to give accurate and adequate information with respect to the use of the product and possible dangers involved in such use.

**3.** Obviously, the above-cited cases carry little persuasive authority due to their being adjudications without this jurisdiction. However, it must be noted that the trial court in *West* submitted the issues surrounding the warning question to the jury, together with testimony of workers professing *expertise* in use of the product in question, which itself conflicted in part, and *expert testimony* relative to the issues. Based upon such proceedings, the Iowa Su-

preme Court held that the parties had presented arguments for jury resolution.

In *Hubbard-Hall Chemical Company*, the First Circuit affirmed a jury verdict for the plaintiffs' intestates against insecticides manufacturers. The case was founded upon Massachusetts negligence law as applied to the adequacy of the defendants' warning affixed to the insecticide. The label in question had been approved by the United States Department of Agriculture under the Federal Insecticide, Fungicide, and Rodenticide Act and the plaintiffs' intestates had little or no comprehension of English. Significant to the instant case are the judge's comments during his jury instructions, conveying his personal position and illustrating the very problem of lack of standards that confronts this Court. While the judge did state to the jury that he commented on the evidence in an advisory capacity, the judge noted that the defendant's compliance with the statutory requirements was evidence of reasonable care, reminded the jury that plaintiff's counsel had suggested " 'that there should be a skull and crossbones on the warning' ", and inquired of the jury whether the defendant " 'should . . . for example, put a coffin on the notice?' "

an ill-defined or insufficient set of guidelines introduced into evidence. No judicial goal could be furthered by placing a jury into a situation in which their role as factfinders is reduced to groping and floundering amidst uncertain legal, expert, or practical standards. Since the constitutionality of directed verdicts was attacked in *Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943), the subject has prompted criticism, scholarly opinion, and grueling and vexatious dilemmas for judges. In sustaining the procedure against the looming Seventh Amendment guarantee, the Supreme Court stated:

> Whatever may be the general formulation [for standards of proof required for submission of evidence to the jury], the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked. 319 U.S. at 395, 63 S.Ct. at 1089.

With the recognition that any inference is speculative to some extent, see *Lavender v. Kurn*, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), the critical issue has been posited as one of policy. Bagalay, Directed Verdicts and the Right to Trial by Jury in Federal Courts, 42 Tex.L.R. 1053 (1964).[4]

■ Mindful of these overriding philosophical considerations, the Court approaches the instant motion and the guidelines enunciated in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc) in measuring its propriety.

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. 411 F.2d at 374–75 (footnote omitted).

In a diversity case, the prerequisite to jury submission demands that the evidence present more than a theory that would permit speculation and more than a mere scintilla. *Holcomb v. Cessna Aircraft Company*, 439 F.2d 1150 (5th Cir. 1971), *cert. denied*, 404 U.S. 827, 92 S.Ct. 62, 30 L.Ed.2d 56 (1971).[5]

---

4. It has been stated that "*Galloway* open[ed] the door to a rational system of jury supervision based upon the policy of keeping juries from acting unreasonably," and simultaneously recognized that "[t]o permit a jury to find the facts contrary to overwhelming evidence, or upon wholly insufficient evidence would license juries to undermine the law." Currie, Thoughts on Directed Verdicts and Summary Judgments, 45 U.Chi.L.Rev. 72 (1977).

5. *cf.* This case is devoid of even self-serving testimony to support the plaintiff's theory of inadequate warning. It has been repeatedly held that such evidence, in the teeth of universal experience, will not support a jury verdict nor can self-serving statements alone suffice to create a jury question under *Boeing Co. v. Shipman, supra; Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977); *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347 (5th Cir. 1976). Wary of self-interest or speculation as to causation, the Fifth Circuit has stated, "a directed verdict, or judgment notwithstanding the verdict, is the proper safeguard against such speculation by the jury." *Ralston Purina Co. v. Hobson*, 554 F.2d at 729.

With no showing of a defective catalytic converter nor of the inadequacy of instructions found in the Toyota owner's manual—indeed with the absence of standards for the jury to utilize in such a determination—the Court cannot find that the plaintiff presented sufficient evidence on the threshold prong of his products liability claim. The cumulative effect of not having established that the product was defective could only manifest itself in additional jury speculation regarding the cause of the plaintiff's injuries. The Court cannot find that the plaintiff presented a conflict in substantial evidence. There being no resultant jury question, the proper judicial course demands that the verdict be overturned.

The above discussion similarly supports the alternative motion for a new trial. The Court rules on the new trial request in accordance with Rule 50(c)(1) of the Federal Rules of Civil Procedure. While cognizant of judicial prohibitions against substituting the Court's judgment for that of the jury, *Love v. Sessions*, 568 F.2d 357 (5th Cir. 1978), the Court must find that the jury verdict is contrary to the great weight of the evidence.

## CONCLUSION

Based on the foregoing authorities and analysis, the Court hereby GRANTS the motion of the defendant, Toyota Motor Sales, U.S.A., Inc., for judgment notwithstanding the verdict, and, alternatively, for a new trial.