# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2013

No. 13-30030

Lyle W. Cayce
Clerk

ST. BERNARD PARISH, through the St. Bernard Parish Government,

Plaintiff-Appellant,

v.

LAFARGE NORTH AMERICA, INCORPORATED; DENNIS MILLON;
EDWARD L. BUSCH; JENNIFER MILLER ARNOLD,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:11-CV-2350

Before DAVIS, JONES, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Plaintiff St. Bernard Parish (the Parish) appeals from the dismissal on summary judgment of its claims against defendant Lafarge North America, Incorporated (Lafarge). The Parish alleges that a barge improperly moored at Lafarge's facility broke free during Hurricane Katrina and caused two breaches in the Industrial Canal resulting in extensive flooding and damage to the Parish. We reverse, based on our conclusion that questions of fact are presented that preclude summary judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-30030

I.

Following Hurricane Katrina, several lawsuits were filed alleging that a barge, the ING 4727, which was improperly moored at a facility owned by Lafarge, broke free and allided with the floodwall of the Industrial Canal breaching it in two places. The suits also allege that extensive flooding resulted, causing damage to numerous parties. These cases were consolidated as the Barge Litigation Track in *In re Katrina Canal Breaches Consolidated Litigation*, USDC EDLA No. 05-4182. Following denial of class certification, four named plaintiffs were selected to try their cases in an exemplar bench trial, which took place in 2010. After the trial, the district court issued a ruling in January 2012 concluding that the barge could not have caused the breaches and dismissed the claims by the four exemplar plaintiffs. Lafarge then moved for summary judgment as to all remaining named plaintiffs, which motion was granted.

The Parish was not a party in the cases that were consolidated in the Barge Litigation Track. After the district court denied class certification, the Parish and other claimants who were not yet plaintiffs entered into a Tolling Agreement with Lafarge that suspended the statute of limitations pending completion of the test case trial proceedings. The Tolling Agreement provided that

> the discovery record in the test cases will be part of the record for the purpose of avoiding discovery that is cumulative or duplicative. This does not constitute or give rise to any waiver of rights to challenge evidence from the discovery record of the test cases. Furthermore, this is not an agreement to permit res judicata or estoppel, or law of the case to result from

2

evidence from the discovery record of the test cases.

In August 2011, following the district court's dismissal of the claims of the four exemplar plaintiffs, the Parish filed suit against Lafarge in Louisiana state court. Lafarge timely removed the case to federal court in September 2011.

On June 14, 2012, the district court issued a scheduling order in this case under which motions for summary judgment could be filed at any time, but setting a deadline for filing of expert reports by February 19, 2013. Lafarge filed a motion for summary judgment on July 5, 2012. On August 10, 2012, after receiving two extensions of its summary judgment submission deadline, the Parish filed a motion under Federal Rule of Civil Procedure 56(d) requesting more time for its experts to develop their opinions and to take fact discovery. In support of the motion, the Parish's expert stated that it was anticipated that the analysis could be complete within 90 days (or until approximately November 10, 2012). The Parish filed a response to Lafarge's motion for summary judgment on August 21, 2012 and Lafarge filed a reply on August 31.

The district court did not immediately rule on any of the motions. Within the next 90 days the Parish did not seek any discovery, and its experts did not complete their analysis. On November 24, 2012, the Parish filed a motion to supplement the record, asked the court to suspend consideration of the motions, and projected that the expert reports would not be available until January 2013 (still within the deadline for experts reports per the scheduling order).

No. 13-30030

On December 6, 2012, the district court denied the motion for continuance, finding the Parish had not been diligent in completing discovery. The district court analyzed the items of fact and expert testimony the Parish stated that it needed time to develop and concluded that none of them provided any reason to believe that further development would raise a genuine issue of material fact about whether the barge caused the canal breaches.     The district court then entered summary judgment in favor of Lafarge based on the evidentiary record before it, including the record from the trial of the exemplar case.     The Parish appeals.

The Parish asserts that the district court abused its discretion by denying its motion for a discovery extension under Rule 56(d) prior to ruling on the motion for summary judgment.     It also argues that the testimony of its eyewitnesses and the reports of its expert testimony create an issue of fact as to whether the barge caused the canal breaches.

## II.

This court reviews the district court's denial of the Parish's Rule 56(d) motion for abuse of discretion.     *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1441 (5th Cir. 1993).     Rule 56(d) permits the district court to allow additional time to take discovery to respond to a motion for summary judgment when the nonmovant shows that it cannot otherwise present facts essential to justify its opposition to the motion.     Fed. R. Civ. P. 56(d).     A party seeking relief under Rule 56(d) must show that it has exercised due diligence in the pursuit of discovery.     *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001) (declining to consider whether plaintiff has shown why she needs additional discovery to create a genuine issue of fact, because she had not been

diligent.).    That more time is available for discovery under the scheduling order does not by itself defeat summary judgment or support granting a motion under 56(d).    *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1396 (5th Cir. 1994) (plaintiffs undertook almost no discovery for more than a year after motion for summary judgment was filed and should not have relied on scheduling order deadline allowing discovery until future date).

The district court found that the Parish had not been diligent in pursuing discovery based on the following facts:

> Lafarge has been the subject of this inquiry for more than seven years. St. Bernard has had years to find and prove its theories. Indeed, once class certification was denied on May 21, 2009, St. Bernard was aware that it would in all likelihood have to file its own suit to recover for its own damages. It entered into a Tolling Agreement that indeed protected it from any prescription argument considering that Hurricane Katrina hit on August 29, 2005. The kind of "discovery" and expert testimony sought is not dependent in any way on discovery to be gotten from Lafarge. It is satellite imagery driven and is material that has been available to these experts from the get-go.
>
> St. Bernard filed the subject suit on August 23, 2011. Regardless of which defendants and where the case was to be tried, it knew what had to be proven. It has been 16 more months; St. Bernard still does not have an expert report that outlines any fact or equation that allows this Court to find that its previous findings are incorrect and irrebuttable. Instead, the Court has affidavits containing vituperative diatribe as to the Lafarge experts' failures and promises that their

superior methods will show something different.

In addition, when the Parish filed its motion to supplement the record in November 2012, it stated that the experts' analysis, originally promised in early November had been delayed by illness in the expert group.   It promised completion in January 2013, but provided no update or preliminary findings of their studies.

The Parish argues that it was not a party to the Barge Track Litigation and based on that fact, the district court erred in denying its motion. However, even disregarding the Barge Track Litigation, the district court correctly noted that 16 months had passed since this suit was filed and more than the 90 days the experts originally stated would be required to complete the analysis.   The discovery needed by the Parish—its own final expert testimony—was not dependent on the defendant but rather facts and reports completely within its control.   In addition, the Parish provided no update to the experts' work when it moved to supplement the record in November 2012 with findings it expected to be concluded in January 2013.

> Even though rule 56(f) motions should be liberally granted, "[a] district court has broad discretion in all discovery matters, and such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse."   *Kelley v. Syria Shell Petroleum Dev., B.V.*, 213 F.3d 841, 855 (5th Cir.) (internal quotation marks omitted), *cert. denied*, 121 S. Ct. 426 (2000).

*Beattie*, 254 F.3d at 606.   In *Beattie*, the plaintiff had several months after she sued to depose the board members whose testimony was needed to oppose the defendant's motion for summary judgment.   She suspended discovery for

No. 13-30030

settlement talks and failed to file an extension when she knew 16 days prior to the deadline that the depositions could not be scheduled and waited to seek an extension until the defendant filed a motion for summary judgment.

The facts in this case are not materially different.   Based on the time line in this case, we see no "unusual circumstances showing clear abuse" by the district court.   *Id.*   Because the Parish did not diligently pursue the discovery it needed to prosecute its claims, we need not address why the Parish needed additional discovery to create a genuine issue of fact.   *Id.*

III.

Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

For purposes of applying these rules to this case, further background on the facts is helpful.   The two breaches that were allegedly caused by the barge occurred in the Industrial Canal between the Claiborne Avenue Bridge to the south and the Florida Avenue Bridge to the north.   The Lafarge terminal is located on the west bank of the canal closer to the Florida Avenue Bridge. That is the presumed starting point for the barge before the storm for the defendants.   The Parish presented testimony from two eyewitnesses who saw the barge loose in the canal near the Claiborne Avenue Bridge.   The breaches took place on the east bank of the canal.   The north breach is across the canal and slightly north of the Lafarge terminal and the south breach is about 1500 feet south of the terminal. The barge, when it is empty as it was at the time of

these events, extends 13 or 14 feet above the water.   The winds of Hurricane Katrina at all relevant times were blowing from the northeast.   The wave action of one to two feet in the canal was from the north towards the south. Thus for the barge to cause the breaches, it would have had to cross the canal and travel across the canal to the areas of the breaches against the direction of the strong sustained winds and tide.

The district court's judgment in this case is based on its conclusion that with hurricane strength winds blowing from the northeast at all relevant times and the tides moving from the north to the south with one to two foot waves, there is no plausible way the barge could have moved contrary to those natural forces (whether from a starting place in the Lafarge facility or loose in the canal) to cause the north or the south breach on the east side of the Industrial Canal.   The district court also considered photographic evidence captured the next day showing the barge at rest on top of power lines and next to an upright school bus that was on the levee side of the barge.   The court inferred from this that the flood waters had already breached the Canal when the barge entered the area, so that the barge floated above the school bus which was already under water.   The district court also noted that striations on the bottom of the barge matched bent rebar at the far southern end of the southern breach, away from the area where the breach had already formed.   In short, the court inferred from this evidence that the barge floated into the parish with water from the Industrial Canal after the levees were breached.

The Parish points to several pieces of evidence that it argues create a genuine issue for trial.   The Parish points first to the testimony of eyewitnesses who were present during the storm near the sites of the levee

breaches on the east bank of the Canal.   Multiple witnesses heard noises prior to the breach described as scraping, banging or grinding that the Parish argues is consistent with their theory that the barge first traveled along the east levee wall, banging and scraping against it before breaking through in two locations.

Two eyewitnesses saw an object consistent with the size of the barge actually break through the levee at both the north and south breach locations. William Villavasso, Jr. was an employee of the New Orleans Sewerage and Water Board and chief operator of the pumping station located at the site of the north breach.   He testified that between 3:00 a.m. and 4:00 a.m. he saw water splashing over the levee.   At approximately 6:00 a.m., he heard a sound like an explosion and saw a couple of sections of the levee tumble over.   He saw what appeared to be a metal structure like a barge protruding through the break in the levee wall.   At that time, massive amounts of water started flowing in through the breach.    Terry Adams, a resident of the lower ninth ward who lived one block away from the north breach, testified that some time after 5:00 a.m. he was on his roof and looked south toward the Claiborne Avenue bridge.   He saw an object that looked like a big black house in the canal easing south along the east levee wall.   The object bumped into the wall a few times, making noises like an empty container squeezing up against the levee.   Then the object crashed into the levee breaking through the previously intact wall at the south breach.   A tidal wave of water came with it through the breach, flooding the area.   When it got light later in the morning, he identified the object as a barge.

In addition, the Parish's experts, although their analysis was never finalized and submitted to the court, opined in their affidavits that the

9

No. 13-30030

defendant's expert analysis was flawed in several respects.[1]    First Dr. Datta's declaration sets forth that the defendant's experts are incorrect because they did not use generally accepted scientific methods.    In general, Dr. Datta states that the wind measurements on which the defendants rely are from higher elevations than those that would have occurred nearer the ground at the level of the barge and that various phenomenon could have resulted in variances in wind direction at surface levels. Second, the affidavit of Dr. Roy was attached to Dr. Datta's declaration.    He concludes, based on satellite imagery, that the barge was loose in the Industrial Canal and located near the Claiborne Avenue Bridge at 6:52 p.m. on August 28, 2005, contradicting the defendant's experts starting time and journey within the canal.    Dr. Roy also reviews data from the subject area indicating that mesocyclones and strong multilevel wind shears occurred during the relevant time periods.    These phenomenon can change the wind pattern locally and those wind changes would not be picked up at other recording sites.    Dr. Roy concluded,

> taking in to consideration the eye witness accounts
> that the barge hit the flood wall, and the witnesses
> heard the scrapping [sic] along the flood wall, that it is

---

[1]    Under Fed. R. Civ. P. 56(c)(1)(A), affidavits and declarations generally are admissible summary judgment evidence.    Rule 56(c)(4) further provides: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."    By directly addressing the substance of the Parish's experts' affidavits, the district court implicitly found that the affidavits met this standard.    The district court has broad authority over evidentiary matters, including the admissibility of expert testimony, *Smogor v. Enke*, 874 F.3d 295, 297 (5th Cir. 1989), and we will not disturb the district court's decision to consider the substance of these affidavits, particularly where that admissibility has not been attacked on appeal.    We make no statement regarding the ultimate admissibility of the Parish's experts' testimony on remand, and in any event the eyewitness testimony alone would suffice to preclude summary judgment in this case.

> more likely than not that these strong multiple level wind shears, and mesocyclones created winds in all directions, North, East, South and West, that would have sufficient force to have moved the barge from the area depicted [on the satellite image] to the areas where the breaches occurred.

Lafarge notes that Dr. Roy's affidavit does not say that the wind shears or mesocyclones affected surface winds at a level that would have impacted the barge and does not give the duration of their wind affects.[2]

Despite the Parish's evidence, the district court granted summary judgment in favor of the defendants after adopting a number of findings of fact made by the district court in the exemplar case. Although the district court in the exemplar case had stated that "[t]he instant decision is not based on credibility," we must note that those findings were made following a bench trial, based on the evidence presented there and the district court's evaluation of that evidence, including its decisions on the credibility of the witnesses. No appeal was taken from the findings of fact, and those findings were not binding on the appellant with respect to this motion for summary judgment. Stated differently, the court was required to determine the credibility of the witnesses in the exemplar trial, but the court is not entitled to make those calls on a motion for summary judgment, which must be denied if there is any genuine issue of material fact.

---

[2]    The district court's opinion in the exemplar trial states that such wind bursts last only three to five seconds. The district court opinion in this case did not address that issue except to adopt the findings in the exemplar trial that "a highly anomalous weather or tidal event such as a series of microbursts or a 20-foot tidal wave" did not occur.

No. 13-30030

Here, the district court reasoned that the exemplar case's "findings as to wind direction were not based on credibility calls" because they were "the result of measurements taken during the storm and scientific calculations extrapolated from various gauge readings as well as the laws of nature." Thus, the district court adopted these findings from the exemplar trial essentially as uncontroverted facts for purposes of this motion for summary judgment:

> \* Buys Ballot's Law demonstrates that the prevailing wind direction in the northern hemisphere caused by a hurricane is counter-clockwise in direction. Based on the track of the storm, the winds at the IHNC at the time of the North and South Breaches (4:00 a.m. to 7:45 a.m.) blew in a northeasterly direction. Since the Lafarge Terminal lies on the west bank of the IHNC, these winds would have pushed the Barge towards the west and away from the east bank where the breaches occurred.
>
> \* Even if the Barge had come loose as some eyewitnesses testified by Sunday and was at the southern end of the IHNC between the Claiborne and Florida bridges, these winds would prevent the Barge from traveling in a northerly direction. Data from the Oceanweather Inc.'s hindcasts demonstrated that the hurricane winds at the IHNC blew from the northeast at all times prior to 7:42 a.m.
>
> \* Data taken from Lakefront Airport, four miles from the IHNC location verified [that the] winds blew from the northeast between 3:00 a.m. and 7:53 a.m.

&ast;  Team Louisiana also concluded that the wind at the IHNC came from the northeast until no earlier than 8:30 a.m. or 9:00 a.m. making it impossible for the Barge to be traveling in an easterly direction prior to that time.

&ast;  The North Breach occurred no later than 6:00 a.m. and the South Breach occurred at approximately 7:00 a.m.

&ast;  The unrefuted testimony and pictorial evidence was that the waves moved in a southerly direction and were between a foot to two feet.

After adopting these generally objective findings, the court proceeded to adopt, without further discussion, the central finding of fact in the exemplar case that "the physical evidence rendered ludicrous that a barge could have been propelled by microbursts such that the two breaches would have been caused by the Barge."

The district court essentially found that, consistent with the findings of fact in the exemplar Barge Trial, the Parish's theories were refuted by the laws of nature. The district court found that for the Parish to be correct, the barges would have had to move with no motor propulsion counter to the prevailing 70 mph winds at the relevant times established by several independent sources. The district court found that Parish's experts failed to state any plausible explanation as to how localized winds would act in such a way to cause the barge to move against the prevailing winds. The experts gave no examples of how this might occur and provided no preliminary findings to support their theories. In addition, the district court found that two photos disproved the plaintiff's theory. The photos of the south breach show that when the barge

13

exited the canal it floated over a school bus without hitting it and came to rest on top of utility lines.   According to the district court, these photos prove that the neighborhood was already flooded when the barge arrived at the scene, and as concluded by the district court was a consequence not the cause of the breach.

The main obstacle to summary judgment in this case is the eyewitness testimony.   To overcome that testimony, the moving party would have to show that the events testified to by the eyewitnesses were a physical impossibility and that the witnesses' testimony was therefore incredible.   That is fundamentally what the district court found in this case.   It was also, of course, the court's determination after the bench trial of the exemplar case, when it concluded, after finding that the barge did not cause the breach, that "[t]here is no credible evidence which contradicts this finding."

There is a great deal of testimony supporting Lafarge's position, to be sure, and little to support the Parish's, but we are mindful of the summary judgment standard.   To completely discount the Parish's eyewitness testimony and proposed expert testimony altogether would be unusual at the summary judgment stage, to say the least.   In at least one case, however, this court has held that testimony that is contrary to the laws of nature and physical facts and discredited by experts cannot support a verdict for the nonmoving party, and thus is insufficient to create an issue of fact.   *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729-30 (5th Cir. 1977).

In *Ralston Purina*, the plaintiff argued that the defendant's failure to deliver feed caused him to lose 18,000 chickens.   He theorized that starvation incited cannibalism by pecking, that starvation lowered the bird's body

temperatures and induced piling to keep warm causing birds to smother, and that a stampede to get to the new feed when delivered killed hundreds of birds. He did not witness any of these phenomenon actually occur.   Uncontroverted expert testimony established that chickens do not engage in the behavior theorized by the plaintiff.   This court held that "[e]vidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict."   *Id.* at 729.   Accordingly, this court set aside the jury verdict for the plaintiff.

In *Dotson v. Clark Equipment Company*, 783 F.2d 586, 588 (5th Cir. 1986), this court described *Ralston Purina* as involving the self-serving testimony of the plaintiff versus the uncontradicted testimony of the defendant's experts.   In *Dotson*, the plaintiff presented a "far-fetched" but not impossible version of the events leading to his injury.   However, he also introduced the testimony of experts supporting his version of the accident. Clark Equipment presented other witnesses to discredit his case.   In this circumstance, we found that "the question of a witness's credibility is the purest of jury issues."   *Id.*, citing *Hindman v. City of Paris, Texas*, 746 F.2d 1063, 1068 (5th Cir. 1984).

In our view, this case is more like *Dotson* than *Ralston Purina*.   The eyewitnesses who support the Parish's version of events may have some self-interest but they are not the plaintiff.   In addition, multiple witnesses reported evidence consistent with the Parish's theory.   The barge was sighted floating free before the storm hit, several eyewitnesses heard noises that sounded like an object banging or scraping against the levee wall and two eyewitnesses in different locations saw the barge or something that looked like

No. 13-30030

a barge break through the levee at both the north and south breaches. Further, the expert testimony presented by the defendants is countered by the preliminary report of the Parish's experts that discredits their methodology, although they are unable to posit an opposing theory of events.   Even if the district court was correct to dismiss the plaintiff's experts report, defendants cite no case where this court has affirmed a grant of summary judgment when there is third-party eyewitness testimony supporting the allegations of the nonmovant.   The district court's opinion in this case does not address this testimony.   To withdraw a case from the jury, the testimony in support of the nonmovant's position must be "not just implausible but utterly implausible in light of all relevant circumstances."   *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).

In this circumstance, this case cannot be resolved on summary judgment but must be left to the fact finder.

IV.

Accordingly, we reverse and remand this case to the district court.[3]

---

[3] We see no reason to assign this case to a different district judge.   It is normal and proper for a judge to sit in the same case upon remand.   *Liteky v. United States*, 510 U.S. 540, 551 (1994).