387 So.2d 13 (1980)
Clara Sue COBB et al., Plaintiffs-Appellees,
v.
INSURED LLOYDS et al., Defendants-Appellants.
No. 7716.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1980.
Rehearing Denied August 22, 1980.
*14 Milling, Benson, Woodward, Hillyer & Pierson, Charles D. Marshall, New Orleans, for defendants-appellants.
Provosty, Sadler & deLaunay, William H. deLaunay, Alexandria, for plaintiffs-appellees.
Stafford, Stewart & Potter, Grove Stafford, Jr. and Russell L. Potter, Gold, Little, Simon, Weems & Bruser, Henry B. Bruser, III, Alexandria, for defendant-appellee.
Rivers & Willson, Larry Rivers, Alexandria, for plaintiff-appellant.
Before CULPEPPER, SWIFT and STOKER, JJ.
*15 CULPEPPER, Judge.
Clara Sue Cobb was injured by the accidental discharge of a revolver, located behind the front seat of an automobile in which she was a passenger. In the present suit, she and her father, Howell Cobb, sue Gabriel Bell, owner and operator of the automobile and owner of the revolver, and Insured Lloyds, Bell's automobile liability insurer. In a companion suit, they sue J. P. Sauer & Sohn, manufacturer of the revolver, and Hawes Firearms Company, distributor of the revolver. A jury awarded Howell Cobb $85,000 and to Clara Sue Cobb $700,000 against defendants, Gabriel Bell, Insured Lloyds, J. P. Sauer & Sohn and Hawes Firearms Company, in solido. Defendants Sauer and Hawes appeal. Clara Sue Cobb answered the appeal, seeking loss of earnings and an increase in general damages.
On appeal, appellants contend the jury was manifestly erroneous in finding (1) the revolver was in normal use, (2) the revolver was unreasonably dangerous for normal use, either because the design was defective or warnings inadequate, (3) defective design or failure to warn was a legal cause of the accident, (4) Clara Sue Cobb's damages are $700,000, and (5) Hawes Firearms Company is liable. Defendants contend the trial judge erred in (1) instructing the jury on the use of a product manufactured by a third party, (2) in allowing the jury to know Bell's insurance policy limits, and (3) in denying defendants' motion for directed verdict.
The general facts giving rise to the accident are undisputed. On the night of February 12, 1976, Gabriel Bell drove to the Howell Cobb residence, intending to take Clara for a ride. On the front seat of his car, Bell had the fully loaded revolver in a holster with the hammer "flush to the cylinder."
Bell arrived at the Cobb residence at approximately 10:30 P.M. Before Clara entered the automobile, Bell placed the holstered revolver on the rear floorboard on the driver's side. Bell and Clara drove around for approximately an hour and a half. Near midnight, they were driving on Highway 28, heading towards Alexandria. Immediately after crossing a small bridge, Bell heard a loud explosion and instantaneously determined that the revolver had discharged, wounding Clara. The bullet went up through the passenger seat, entered Clara's body through the left flank and passed through her body, transecting the spinal cord and exiting near the right shoulder.
Bell proceeded to the emergency room at St. Frances Cabrini Hospital in Alexandria. Clara was examined by Dr. Harry Brian, who determined her spinal cord had been severed. He directed that she be transferred to Baton Rouge for surgical assistance. In Baton Rouge, she was treated by Drs. Adrian Kell McInnis and John Robert Clifford for ten days before being transferred to Houston.
Clara's first period of treatment in Houston was from February 23 to June 6, 1976. Dr. Roy Edward Carter, director of rehabilitation, gave the following summary of her treatment and condition:
"Diagnosis was spinal cord lesion secondary to gunshot wound at approximately T-11 . . . she was thought to have a T-9 paraplegia, neurogenic bladder, neurogenic bowel, pulmonnary congestion, left renal contusion by history, atelectasis the right upper lobe, acute respiratory failure, pneumonitis of the left lower lobe, diagnosis of obesity, bronchitis, a left femoral thrembophlebitis, urinary tract infection and previous history of spleenectomy (performed in Baton Rouge)."
Clara returned to Alexandria in June to gain strength for rehabilitation therapy, which began in Houston in November, 1976. Upon discharge in January, 1977, Dr. Carter gave the following report:
"She was doing very well at the time of discharge, which on second admission was January 15th, 1977 . . . . She was medically doing well. Her general nutrition was much higher than it had been, her blood count had returned to normal. She was doing her [intermittent] cath., *16 had been taught this and taught all of her nursing activities, the urine was sterile with no evidence of bacteria. She was independent in all of her wheelchair activities, which meant that her transfers back and forth as we mentioned before were done without assistance. She completed her driving training program. She was finishing homemaking activities which basically consist of fixing simple meals and fixing bed covers and so forth, and was subsequently discharged then on January, 15th."
Clara returned to Houston for a third extended period of treatment from November 27, 1977 to approximately January 9, 1978, during which she completed rehabilitation training. Although Clara has made remarkable progress, she will require medication and treatment for the rest of her life. According to Dr. Carter, the primary problems of the paraplegic are as follows:
"The major problems that would face any paraplegic would be two very significant ones. One, of course, is urinary tract infection, which may ascend from the bladder to the kidneys and compromise the kidneys' function, and/or result in kidney stones, which may result in the same type of thing. The second major problem is that of involving the skin, which because of the anesthesia and alteration of its own circulation is more sensitive to thermal injury from either severe hot sun or external heat of any type, hot water, et cetera, as well as an increase sensitivity to pressure, that the individual cannot feel, to pressure ulceration as we mentioned before. The third area, not quite as common as the first two, depending on the level of the spinal injury, would be that of a lowered resistance where the patient may get a respiratory infection, which then has to be treated with a little more vigor and a little more intelligence than in the normal individual, because of some impairment of ability to cough and clear secretions out of the lung."
The weapon which caused Clara's injuries is a Hawes "Western Marshal" single-action revolver. It was manufactured in Germany by J. P. Sauer & Sohn in December of 1974 and shipped to California to the Hawes Firearms Company, sole distributor for Sauer at that time. As required by U. S. law, the name of both the manufacturer and the distributor is forged onto the gun by the manufacturer. Under an agreement existing between the two companies, Hawes was responsible for operating instructions and provided a warranty certificate with the following instructions and information:

THE HAWES "WESTERN MARSHAL" ORIGINAL SIX-SHOOTER REVOLVER LOADINGFIRINGCORRECT CARE
GENERAL. The Hawes "Original" Western Marshal Six-Shooter is one of the most simple, rugged and dependable handguns ever manufactured. Used correctly it will serve you indefinitely without ever requiring major repairs. Before handling or shooting the Western Marshal Six-Shooter, BE SURE to read the instructions and carefully note the precautions listed.
ACTION: "Single Action" means that the hammer of this revolver must be drawn backor "cocked"with the thumb, before each shot is fired. When cocking the Marshal Six-Shooter, notice that there are three distinct hammer positions as follows:
1. SAFETY POSITIONwith the firing pin held safely away from the cartridge primer, by pulling the hammer back to the first click or safety position. The revolver should always be carried in this position. With the hammer in this position the firing pin will not touch the rear of the cartridge in the cylinder.
2. HALF-COCKwith the hammer approximately half way back and the cylinder bolt depressed, leaving the cylinder free to rotate.
3. FULL-COCKwith the hammer all the way back and the revolver ready to fire.
IMPORTANTThe Safety and Half-Cock notches are designed to prevent the trigger from being pulled, so DO *17 NOT try to force the trigger with the hammer in either of these two positions. If it is desired to lower the hammer, pull the hammer back slightly; then pull the trigger and lower the hammer carefully.
LOADING. Draw the hammer back to the Half-Cock position. Do not touch the trigger but leave it free to snap into the notch. (NOTE: If the hammer should be at the Full-Cock position, lower it all the way first and then draw back to Half-Cock. Otherwise, the bolt cam lever cannot operate to release the cylinder.) This will leave the cylinder free to rotate for loading. Open the Loading Gate on the right-hand side of the revolver and load each chamber. Close the loading gate.
UNLOADING. After firing, draw the hammer back to Half-Cock position, open the gate and operate the ejector (located under the barrel) to eject the empty cartridge cases.
WARNING. "Fanning" the Western Marshall Six-Shooter is not recommended. To permit "Fanning," the internal mechanism of any single action must be specially altered. This alteration may render the revolver both unsafe and/or unsatisfactory for general all-around shooting.
On May 14, 1975, the revolver was sold and shipped to Security Jewelers in Alexandria, Louisiana, where Bell purchased it on January 12, 1976, exactly one month before the accident. Bell testified that he did not receive any instructions with the gun, which he carried out of the store in a bag. Bell handled the revolver according to his own understanding and experience. He had previously owned approximately eight different types of rifles or handguns. Bell also frequently read magazines having to do with guns and ammunition.
As on the night in question, it was Bell's practice to carry the revolver fully loaded with the hammer flush against the cylinder in the "full forward" position. He had done so with the only other single action revolver he had owned, a Ruger .44. Bell felt the revolver was "perfectly safe" when carried in this manner. Unfortunately, this was not correct. When the Hawes revolver is fully loaded and the hammer is in the full forward position, the firing pin rests on the primer of the cartridge in the chamber. In this position, the revolver may discharge if the hammer is struck a blow sufficiently sharp to cause the firing pin to ignite the primer.
The Hawes-Sauer revolver has a safety design known as the "sear safety" or "sear safety notch." The revolver's hammer is notched for the three positions listed above in the instructions. As the hammer is drawn back, the sear can be engaged in any of the notched positions. The first position, also called the "quartercock", is the safety position. The hammer was not in this position at the time of the accident.
NORMAL USE
The first issue on appeal concerns the effect of Bell's failure to have the hammer in the safety position. In Weber v. Fidelity & Casualty Insurance Company, 259 La. 599, 250 So.2d 754 (1971), the court held a product is defective if "unreasonably dangerous to normal use." We stated in the case of Avoyelles Country Club v. Walter Kidde & Co., 338 So.2d 379, 382 (La.App. 3rd Cir. 1976) the relevant inquiry is "what was the normal or intended use of the product, and was plaintiff making such normal or intended use of it?"
Appellants argue the normal or intended use of the revolver was to carry it in the quartercock position. The instruction card explained three possible cocking positions and stated the revolver should always be carried on what was labeled as the "Safety Position." Because Bell was carrying the revolver contrary to the instructions, appellants argue the revolver was not in normal use.
We believe appellants have drawn the concept of normal use too narrowly. In the case of Fox v. American Steel Building Company, Inc., 299 So.2d 364 (La.App. 3rd Cir. 1974) we stated:
". . . the law does not require that the manufacturer make the product `fool proof' or `accident proof.' It does require, *18 however, that it exercise reasonable care in the design and fabrication of its products which are of such a nature that, if not carefully made, can cause foreseeable injury to persons using the products for purposes which the manufacturer may reasonably expect them to be used. Failure of the manufacturer to exercise such care renders it liable if injury results from the lawful use of the product in a manner and for a purpose for which the manufacturer may be deemed to reasonably expect. Leathem v. Moore, 265 So.2d 270 (La.App. 1st Cir. 1972); Gauthier v. Sperry Rand, Inc., 252 So.2d 129 (La.App. 3rd Cir. 1971) supra."
Normal use is a matter of foreseeable use and may include something broader than operation exactly in accordance with the manufacturer's instructions. See, Fox v. American Steel Building Company, Inc., supra; Avoyelles Country Club v. Walter Kidde & Company, supra; AMCO Underwriters of Audubon Insurance Company v. American R & S Corp., 239 So.2d 501 (La. App. 1st Cir. 1976).
In the present case, the revolver was being used for a purpose reasonably foreseeable by the manufacturer. Revolvers are often carried fully loaded. The above quoted instructions state how to load all six chambers. Also, revolvers are often carried in automobiles for protection. The only serious question is whether the manufacturer could or should have reasonably foreseen the revolver would be carried fully loaded with the hammer in the full forward position.
First, we note the obvious fact that the revolver has a full forward position. Appellants own expert, Mr. Edward B. Crossman, recognized full forward as one of four hammer positions for this revolver. The manufacturer's instructions also give directions for placing the hammer full forward "if it is desired. . ." We also consider the fact established through expert testimony that the full forward position is the safety position on many other commonly used handguns. As a manufacturer and distributor of a variety of guns, Sauer and Hawes knew or should have known this, and they should have reasonably foreseen this revolver would be carried fully loaded with the hammer in the full forward position. Accordingly, we find that the manner of Bell's use of the revolver, though not in accordance with the instructions, was within "normal use" of the product.
We next consider the question of whether the revolver was unreasonably dangerous for normal use, either because the design was defective or the warnings inadequate. We will discuss each of these issues separately.
DEFECT IN DESIGN
The record contains much evidence relating to the history and evolution of the single action revolver design. According to the experts, including a representative from the appellants, this type revolver will fire without activation of the trigger if it is fully loaded, the hammer is in the full forward position, and the revolver is either dropped or the hammer otherwise receives a blow of sufficient force. Plaintiffs' and defendants' experts were in disagreement, however, as to how much force is required for such a firing.
Plaintiffs' expert, Mr. Stanton O. Berg, testified as to the amount of force required to fire the weapon with the hammer in the full forward position. Mr. Berg loaded the gun with cartridges armed only with primers, placed it in a test stand, and dropped varying weights from a height of twelve inches on the hammer. He found that the minimum amount of weight which would cause the weapon to fire was four ounces, a force equal to one-quarter point of energy. Two ounces dropped from that height caused indentation on the primer cap, but did not cause a discharge. Based on his tests, Mr. Berg expressed the opinion the gun was very dangerous if carried fully loaded with the hammer down.
Plaintiffs' experts supported their position that the design was unsafe with testimony concerning an alternate design developed by the Ruger Firearms Company for its single action revolver. In 1973, Ruger *19 designed a "transfer bar", which prevents the hammer, in the full forward position, from contacting the firing pin. The inference is that Sauer could and should have developed a similar safety device.
Appellants' experts, Mr. James E. Clark and Mr. Edward B. Crossman, offered their opinions that the design of the revolver was not defective. According to their testimony, Sauer had strengthened the component parts of the sear safety, in order to ensure the revolver would not fire from the safe position. Mr. Clark also discounted Berg's weight test, saying the results were not realistic because the test was performed with the revolver in a vice. Clark and Crossman stated they attempted to duplicate the conditions under which the accident occurred but were unable to make the revolver discharge. Neither could offer any explanation or theory as to how the revolver discharged.
Defendants cite Gauthier v. Sperry Rand, Inc., 252 So.2d 129, (La.App. 3rd Cir. 1971) for the rule that the design need not be "accident proof" or "foolproof." While we agree a manufacturer is not bound to produce a foolproof product, the issue of defective design is factual and depends on the circumstances of each case, Leathem v. Moore, 265 So.2d 270 (La.App. 1st Cir. 1972).
In the present case, the jury was not manifestly erroneous nor clearly wrong in its factual finding that the design was defective. Arceneaux v. Domingue, 365 So.2d 1330 (La., 1978).
ADEQUATE WARNINGS
It is an established principle in the law of products liability that a manufacturer has a duty to give adequate warning of unreasonable danger involved in the normal use of its product, where the manufacturer knows or should know of such danger. Chappuis v. Sears Roebuck & Company, 358 So.2d 926 (La., 1978).
Here, defendants knew the revolver could fire with the hammer in the full forward position, yet they failed to give any express warning of this known danger. The explanation for the safety position states the revolver should "always be carried in this position", but there is no warning of the great danger of carrying the weapon with the hammer down. We find such an express warning should have been given. See American Guaranty & Liability Insurance Company v. Little, 328 So.2d 706 (La.App. 3rd Cir. 1976), for a similar holding.
Appellants make several additional arguments related to the duty to warn. First, appellants contend there was no duty to warn against an obvious danger, such as the fact that a loaded revolver may discharge if not on safety. We do not agree the design defect in this case was an obvious danger. Despite his experience with guns, Bell did not even know of the revolver's dangerous propensity to discharge. Plaintiffs' expert, Mr. Berg, stated it was his opinion the general public did not know the revolver would fire with the hammer in the full forward position. In his opinion, the warnings were "totally inadequate."
Second, defendants contend there was no duty to warn Gabriel Bell because he was a knowledgeable user, who knew or should have known of the danger involved. We reject this argument also. Although he had experience with guns in general, he obviously did not understand safety mechanisms and did not know of the danger involved here. The jury was properly instructed on this issue and decided adversely to defendants' position.
PROXIMATE CAUSE
Appellants next argue defendant Bell's negligence was the sole and proximate cause of the accident. This argument has no merit. The combined negligence of Bell and of the appellants caused plaintiff's injury. See the duty risk analysis and the discussion of intervening negligence in Dixie Drive it Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962).
QUANTUM
Appellants contend the award of $350,000 for future medical expense is excessive. *20 We do not agree. Dr. Carter testified research indicates a paraplegic in plaintiff's condition will require a minimum of $4,000 to $5,000 yearly for routine medical care. This figure does not include any possible complications or hospitalization. The evidence shows plaintiff has already experienced complications on two occasions. The evidence shows a probability of medical expenses beyond routine care. We cannot say the jury abused its much discretion in determining the amount of this award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La., 1977).
In her answer to the appeal, Clara Cobb contends the jury abused its much discretion in failing to make a specific award for her loss of earnings. The evidence shows she was 18 years of age at the time of the accident and had never been employed. Plaintiff now attends college but has little hope of gaining fulltime employment in the future. While she is able to move about independently, plaintiff lacks the physical stamina necessary to continue her movements for an eight-hour work day.
The jury was instructed on the issue of damages as follows:
"Under the law there are two kinds of damages involved in cases of this kind. Namely, special damages and general damages. Special damages are items which usually are susceptible of reasonable and exact proofs, such as medical and hospital expenses, loss of wages and matters of that kind. By general damages, I mean such things as future and past physical and mental pain and suffering; and past, present and future loss of body functions. These damages are not susceptible of any exact proof or mathematical certainty and there is no fixed rule by which they may be determined."
The trial judge clearly distinguished between "special damages", such as loss of wages and "general damages", such as loss of body functions. This is a correct statement of the law. Within its discretion, the jury could have decided the proof of loss of wages was not sufficiently certain for an award of special damages. Also, it could have included loss of body functions in the award of $350,000 for general damages. Considering the awards as a whole, we cannot say the jury abused its much discretion.
LIABILITY OF HAWES AS DISTRIBUTOR
Appellant Hawes contends there is no basis for finding it liable for the defect in the product manufactured by Sauer. We disagree.
The name "Hawes Firearms Co." was forged onto the revolver. Hawes was sole distributor and had responsibility for instruction and warranty repair. Insofar as the American consumer was concerned, Hawes occupied the position of manufacturer. Under the clear holdings of Media Pro. Consult. Inc. v. Mercedes-Benz of N. A., Inc., 262 La. 80, 262 So.2d 377 (1927) and Chappuis v. Sears, Roebuck & Company, 358 So.2d 926 (1978), Hawes is liable in solido with Sauer for the defect in the revolver which caused injury to plaintiff.
POLICY LIMITS
Sauer and Hawes contend the trial judge erred in allowing the jury to be advised that Bell's automobile liability insurance is limited to only $5,000 per person. They argue this was prejudicial to them because the implication to the jury was that a judgment against Bell would be worth very little, whereas a judgment against Sauer or Hawes would fully compensate plaintiff for her serious injuries.
The question of whether liability insurance policy limits are admissible, where a defendant urges inability to pay, has been considered in several recent cases. In Domingue v. Continental Insurance Company, 348 So.2d 209 (La.App. 3rd Cir. 1977), the majority approved the trial court allowing the jury to hear the policy limits, even though the defendant did not urge inability to pay. The author of the present opinion dissented, on the basis that policy limits are admissible only where relevant to a defendant's contention of inability to pay. In Moffett v. Lumpkin, 382 So.2d 278 (La.App. 4th Cir. 1980), the Fourth Circuit has apparently followed the rationale of the dissent *21 in Domingue, concluding that the jury should not be told about the defendant's insurance policy limits unless defendant has raised the issue of his inability to pay. In Guy v. Tonglet, 379 So.2d 744 (La., 1980), there was no issue as to insurance policy limits, but our Supreme Court held that in taking defendant's discovery deposition he cannot be required to answer questions about his financial status unless he first declares that he will raise at trial the issue of his inability to pay.
In the present case, the defendant Bell urged at trial his inability to pay. Thus, under all of the cases cited above and even under the dissent in Domingue, it was proper to permit the limits of Bell's liability insurance to go to the jury. We find no support for the argument by Sauer and Hawes that they were prejudiced by permitting the jury to be advised of Bell's inability to pay.
For the reasons assigned, the judgment appealed is affirmed at the cost of appellants.
AFFIRMED.