**Albert BAKUNAS, et als.**

v.

**LIFE PACK, INC., et als.**

No. 79–1961.

United States District Court,
E. D. Louisiana.

Jan. 26, 1982.

Harry A. Burglass, Metairie, La., for plaintiffs.

Milton E. Brener, R. Travis Douglas, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent that the following findings of fact contain conclusions of law, or the conclusions of law contain findings of fact, they are adopted as such.

### Findings of Fact

1. This wrongful death action was brought by the parents and sisters of decedent, A. J. Bakunas, who died on September 21, 1978, from injuries resulting from a free fall from a height of 323 feet into an air-inflated rescue-type device. The device used by decedent in this undertaking partially collapsed and/or ripped on impact.

2. Made defendants are John T. Scurlock, in his individual capacity as the inventor or originator of the device used, and Air Inflated Products, the corporation formed by Scurlock (and his wife) to manufacture same, as well as other air-inflated products.

3. Scurlock had an agreement with Air Safety Products, Inc., a corporation in which he owned 50% of the stock, to promote and sell the air cushions. The remaining 50% of the stock was owned by Gerald Pfister. Subsequent to this agreement, Pfister and Scurlock formed a new corporation called Life Pack, Inc., which acquired the stock in Air Safety Products. Life Pack, Inc. and Air Safety Products were named as defendants and Pfister was brought into this action as a third party defendant.

4. Scurlock designed various sizes of air cushions primarily for use by fire departments in rescue operations. "Model 007," the particular device or air-inflated unit which is the subject of this litigation, was the only so-called 200 foot-rated cushion manufactured.

5. Bakunas originally was employed by Air Safety Products to demonstrate smaller air cushion devices to fire departments and other related agencies around the country.

Bakunas used a promotional film clip and made demonstration jumps into the unit with which we are here concerned.

6. The 200 foot-rated unit was manufactured in 1974 and, after being used for the various demonstrations above described, was eventually turned over to Bakunas as consideration for fees owed to him by Air Safety Products for his services in these demonstrations.

7. After becoming the owner of this device, Bakunas embarked on a career as a serious stuntman, making use of the device and carefully making jumps from increasing heights. Some of the jumps made by Bakunas included attempts to set records for a free fall. Prior to the jump which is the subject of this litigation, Bakunas successfully jumped from a height of 230 feet into the so-called 200 foot-rated cushion.

8. The usual procedure followed by Bakunas in making these jumps in public included his transporting the air cushion to a proposed jump site by truck and then setting it up in a manner best calculated to make his jump under the conditions which he considered most acceptable and suitable for the particular event. Although Bakunas, sometimes with the help of others, inspected the device after it was inflated and before a jump took place, the unit, in some instances, received treatment which could have caused some nicks and cuts in the material.

9. The air cushion had been transported by truck to Lexington, Kentucky, for the jump which is the subject of this litigation.

10. On the day of the jump which concerns us here, Bakunas was attempting to set a new world record for a free fall from a height over 320 feet. Film of this jump was to be incorporated into a movie under production at the time. Film clips and photos of the jump indicate that Bakunas made a controlled landing near the center of the unit with the flat of his back and head first coming in contact with the surface of the air cushion and with his legs extended in an upward position.

11. The upper layer of the cushion did not withstand the velocity of Bakunas' fall, and he apparently fell through a tear in an upper panel. The lower air cell was not intended to absorb the full impact of a fall from a height of 323 feet. Thus, Bakunas struck the ground below the unit without his velocity having been reduced sufficiently to prevent serious injury.

'12. The material selected by Scurlock for the manufacture of the device was a 19 ounce fabric with a tensile strength of approximately 240 pounds per inch. This material was suitable and appropriate for the purpose for which the unit was manufactured. Although a 26 ounce plastic was available at the time the product was developed, the choice of the lighter material does not constitute a design defect.

13. The manufacturing process included stitching the seams of the panels which formed the device. Plaintiffs' experts suggested that heat sealing the seams would have produced a better, stronger product. Plaintiffs contend that stitching the seams substantially weakened the plastic and, thus, contributed to the failure of the unit. I find that stitching the seams together was an appropriate method of joining the panels under the attendant circumstances existent at the time of manufacture of the product.

14. The air cushion used by Bakunas was comprised of upper and lower compartments and designed to be inflated by the air flow from two portable electric fans in such a manner as to absorb the impact of a falling body without causing injury.

15. The unit was designed so that a falling body would strike the soft surface of the upper air cell. The relatively tight lower air cell was designed to help absorb the energy of the fall.

16. The air cushion had several outlets designed to permit the release of air when a falling body struck the upper cell. The main "breathers" or "lips" were located on each side of the unit. At the time of manufacture and the subsequent reworking of the device at the plant, the "lips" were secured by single bungy cords which were approximately 20″ in length. Bakunas had double tied the bungy cords, making them between 6″ and 12″ long at the time of the jump. The purpose of double tying the bungy cords was to decrease the release of air through the breathers and, thus, increase the rigidity of the landing surface of the upper air cell. This was part of the procedure initiated by Bakunas in his endeavor to make jumps from heights greater than those for which the unit originally was designed and manufactured.

17. The unit had additional air release holes that worked in conjunction with the breathers. The product was manufactured with flaps over these holes which were designed to regulate the escape of air. Bakunas restricted the operation of these flaps, thereby decreasing the rate at which air was released from the bag.

18. The inside of the air cushion contained ribs that were sewn to the top and bottom of the unit. These ribs provided the unit with its shape, strength and structural integrity. Bakunas had made certain alterations to these ribs in order to create a greater air flow within the unit which produced a more acceptable landing surface when he was jumping from increased heights.

19. Some time in late 1975, the unit was returned to Scurlock for certain repairs. At that time, ribs that had been altered were replaced. In conjunction with this, it was indicated to Bakunas by the manufacturer that there should be no change in the structure of the unit's ribs. The air cushion was returned to Bakunas on October 28, 1975, and remained in his possession until the time of the jump with which we are here concerned.

20. Bakunas was apprised of the basic capabilities of the 200 foot unit and understood the risks involved in jumping to set a world record. On several occasions, Bakunas met with Scurlock and Pfister to discuss the capabilities and mechanics of the air cushion. I reject the contention that these alleged discussions formed the basis of any sort of continuing guarantee from the manufacturer or designer of the effectiveness of

the unit regardless of the height from which Bakunas jumped.

21. I find that the alterations made by Bakunas were done in anticipation of the record-setting jump. These alterations, combined with the velocity of decedent's body at the moment of impact, created a pressure on the device greater than that for which it was designed and able to withstand.

### Conclusions of Law

1. Diversity jurisdiction exists in this matter pursuant to 28 U.S.C. § 1332.

■ 2. Although the decedent's jump occurred in Kentucky, Louisiana substantive law will apply. Plaintiffs are New Jersey residents, and defendants either reside or are incorporated in Louisiana. Louisiana, the state of manufacture, has the greatest interest in the application of its law under choice of law principles. *Commercial Union Insurance Company v. Upjohn Company*, 409 F.Supp. 453, 457 (W.D. La.1976).

■ 3. Under Louisiana law, a manufacturer is strictly liable for injuries caused by a product which is unreasonably dangerous in normal use. *Perez v. Ford Motor Company*, 497 F.2d 82, 86 (5th Cir.), *reh. denied* 502 F.2d 1167 (5th Cir. 1974). Neither Scurlock's choice of materials nor his design for joining the nylon panels constituted a defect as to make the air cushion unreasonably dangerous in normal use.

■ 4. Plaintiffs' contentions that defendants are strictly liable for failing to warn the decedent about the qualities of the air cushion are rejected. Although a manufacturer may be strictly liable to one injured by his product when the lack of an adequate warning renders that product unreasonably dangerous in *normal* use, the manner in which Bakunas chose to use the air cushion was one which cannot be construed as "normal." *LeBouef v. Goodyear Tire & Rubber Company*, 623 F.2d 985, 988 (5th Cir. 1980). Additionally, a manufacturer is not required to provide warnings where the dangers involved in failing to

maintain a product are obvious to the user since the presumption exists that a user will know the adverse consequences of his failure to do so. Moreover, Louisiana law is clear that there is no duty to warn when the user has certain knowledge with regard to the product. *Poland v. Beaird-Poulan*, 483 F.Supp. 1256, 1264 (W.D.La.1980); *Tri-State Insurance Company of Tulsa, Oklahoma v. Fidelity & Casualty Company of New York*, 364 So.2d 657, 660 (La.App. 2nd Cir. 1978), *writs refused* 365 So.2d 248 (La.1978). Here, Bakunas was familiar with the mechanics of the air cushion as well as the consequences of altering the unit.

■ 5. Bakunas was aware of the dangers inherent in using the unit to absorb his impact from a height of 323 feet and assumed the risk. *Tri-State Insurance Co. of Tulsa, Oklahoma v. Fidelity and Casualty Insurance Company of New York*, 364 So.2d 657, 661 (La.App. 2nd Cir. 1978), *writs refused* 365 So.2d 248 (La.1978); *Langlois v. Allied Chemical Corporation*, 249 So.2d 133, 140–41 (La.1971).

Defendants are directed to prepare a judgment consistent with these findings and conclusions.