Mrs. Wanda Selman BRANCH,
Plaintiff-Appellant,

Fidelity and Casualty Co. of N. Y.,
Intervenor-Appellant,

v.

CHEVRON INTERNATIONAL OIL CO.,
INC., et al., Defendants-Appellees.

Catherine MARLOWE, etc.,
Plaintiff-Appellant,

Fidelity and Casualty Co. of N. Y.,
Intervenor-Appellant,

v.

CHEVRON, U. S. A., INC., et al.,
Defendants-Appellees.

William C. McMURRAIN,
Plaintiff-Appellant,

Fidelity and Casualty Co., of N. Y.,
Intervenor-Appellant,

v.

CHEVRON OIL COMPANY, et al.,
Defendants-Appellees.

No. 81–3559
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 29, 1982.

Garon, Brener & McNeely, Jacques F. Bezou, New Orleans, La., for Wanda Selma Branch and Catherine Marlowe.

Ivan D. Warner, III, New Orleans, La., Herbert R. Alexander, Bogalusa, La., for McMurrain.

Robert P. Baumgartner, New Orleans, La., for Fidelity & Cas.

McLoughlin, Barranger, Provosty & Melancon, Lloyd C. Melancon, New Orleans, La., for Chevron.

McLinchey, Stafford, Mintz & Hoffman, John E. Galloway, New Orleans, La., for Platform Coating Services, Inc. & Nat. Union Fire Ins. of Pittsburgh.

Faris, Ellis, Cutrone, Gilmore & Lautenschlager, Mat M. Gray, III, New Orleans, La., for Frank Baiden, etc.

Before BROWN, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Wanda Branch, Catherine Marlowe, and William McMurrain appeal from a directed verdict entered against them by the district court after the close of evidence. Finding that the proof raised several factual issues for the jury to resolve and that the trial court used an incorrect legal standard in evaluating the evidence, we reverse the judgment below and remand for a new trial.[1]

I.

This case grows out of yet another offshore oil platform tragedy. The facts are sharply controverted. All are agreed, however, that Richard Branch and James Marlowe, two painters employed by Platform Coating Services, Inc., an independent contractor, were killed in a fall from an offshore oil platform owned by Chevron International Oil Co. (Chevron). Their deaths occurred when a guardrail, to which the painters had anchored their painting scaffold, collapsed. After Branch and Marlowe were spilled from the scaffold some seventy feet into the sea, William McMurrain, a painter's helper, attempted to rescue them. In the course of the rescue, McMurrain sustained injuries.

McMurrain and the survivors of Branch and Marlowe then brought this suit in federal court against Chevron. Under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, as applied in *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), the suit was governed by the laws of Louisiana. The plaintiffs grounded their claims on three provisions of the state law.

---

1. Fidelity & Casualty Co. of New York (Fidelity) intervened as a plaintiff below. After ruling in favor of Chevron, the district court dismissed Fidelity's complaint in intervention. Fidelity has appealed this ruling. Fidelity paid amounts under the Longshoreman and Harbor Worker's Compensation Act, 33 U.S.C.A. § 933, to the plaintiffs-appellants. The parties stipulated that if the plaintiffs prevail against Chevron, Fidelity is entitled to recover its payments out of the judgment won by the plaintiffs. Because we reverse the directed verdict in favor of Chevron, we also reverse the dismissal of Fidelity's claim in intervention.

Two provisions, it is urged, render Chevron strictly liable for the injuries as having been caused by defects in the oil platform, Articles 2317, 2322.[2] One provision bases the claim of Chevron's liability for injuries as having been caused by its negligence, Article 2315.[3] Plaintiffs' strict liability theory was that Chevron had permitted the guardrail to rust and thereby become defective. Because the guardrail had fallen into disrepair, and because its collapse caused the deaths of Branch and Marlowe, Chevron was liable for the damages. Plaintiffs' negligence theory was that Chevron failed to inspect or maintain the handrail and failed to insure that Branch and Marlowe use safety equipment. McMurrain, who responded to the catastrophe with a rescue attempt, alleged that because Chevron was liable for creating the danger to Branch and Marlowe, it was liable to one who was injured in the course of a rescue. *See Grigsby v. Coastal Marine Service, Inc.*, 412 F.2d 1011 (5th Cir. 1969), *cert. dismissed*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

After the presentation of evidence, the district court directed a verdict for Chevron. The court reasoned that Chevron was not negligent because the guardrail, although corroded, was fit for its intended purpose—serving as a handrail. Chevron could not be held liable for the guardrail's collapse when it was misused as a support for the scaffold. Moreover, the court held that Chevron had no duty to supervise the plaintiffs or to require them to use safety equipment.

Alternatively, the court held that even if Chevron were guilty of negligence, the plaintiffs' contributory negligence barred their causes of action. In the court's view, the evidence showed that Branch and Marlowe were contributorily negligent in using the guardrail for a purpose for which it was not intended. They were also contributorily negligent in failing to use available safety harnesses while working and in failing to rig available safety nets below the scaffold.

The district court also directed a verdict for Chevron on the strict liability counts. The court found that Chevron was not strictly liable for injuries caused by the corroded guardrail because the guardrail, even if weakened by rust, was neither defective nor in ruin for its intended purpose. In the alternative, the court held that the contributory negligence of the plaintiffs in using the guardrail to support far more weight than it was designed to bear constituted victim fault and barred any recovery by the plaintiffs.

Having concluded that Chevron was not liable for the injuries suffered by Branch and Marlowe, the court also directed a verdict against McMurrain, the rescuer. The court reasoned that if Chevron was not responsible for the injuries to Branch and Marlowe, it was also not responsible to one who suffered damages in the course of a rescue attempt.

## II.

■ A district court facing a motion for a directed verdict must apply the familiar test of *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc). Under *Boeing*, a case should be allowed to go to the jury, or a jury verdict upheld, unless considering all of the evidence in the light most favorable to the nonmoving party:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and

---

2. Article 2317 provides "we are responsible, not only for the damage occasioned by our own act, but for that which is caused by ... the things which we have in our custody."

Article 2322 provides "the owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."

3. Article 2315 provides in part "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury .... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75.

In directing a verdict for Chevron, the district court transgressed *Boeing* by making factual choices that properly belonged to the jury. In addition, the district court applied an incorrect legal standard to its view of the evidence. Accordingly, the case must be remanded for a new trial.

### A.

■ The Louisiana Supreme Court, in *Olsen v. Shell Oil Co.*, 365 So.2d 1285 (La. 1978), set out the requirements of liability under Article 2322: "(1) there must be a building; (2) the defendant must be its owner; and (3) there must be a 'ruin' caused by a vice in construction or in neglect to repair, which occasions the damage sought to be recovered." 365 So.2d at 185. The building owner's duty is to avoid a "ruin" that imposes an unreasonable risk of danger to persons. *Oliver v. Aminoil, USA, Inc.*, 662 F.2d 349, 352 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1770, 72 L.Ed.2d 175 (1982). Article 2317 imposes strict liability on the owner or custodian of a thing when a vice or defect in the thing causes injury. *Rodrigue v. Dixilyn Corp.*, 620 F.2d 537, 541 (5th Cir. 1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981); *Loescher v. Parr*, 324 So.2d 441, 447–48 (La.1975). A defect exists when the thing poses an "unreasonable risk of injury to another." 324 So.2d at 447–48. Thus, under both of the plaintiffs' strict liability claims, the plaintiffs must show that the oil rig was unreasonably dangerous because of a defect.

The district court found that the guardrail from which the plaintiffs hung their scaffold, although rusted, was not unreasonably dangerous. The court believed that the guardrail was not intended to be used for supporting scaffolds. Because the guardrail was adequate for its intended purpose, the court concluded that no defect existed and that strict liability did not attach.[4]

■ We find that the district court applied a concept of "intended use" which is too stringent. Under Louisiana law, strict liability may be imposed when a product is "unreasonably dangerous in normal use." *Byrd v. Hunt Tool Shipyards*, 650 F.2d 44, 47 (5th Cir. 1981); *Weber v. Fidelity & Casualty Ins. Co.*, 259 La. 599, 250 So.2d 754 (1971). "Normal use" is not limited to "intended use." Rather, "[n]ormal use is a matter of foreseeable use ...." *Cobb v. Insured Lloyds*, 387 So.2d 13, 18 (La.App. 1980). In *Cobb*, the court held that it was foreseeable, and therefore normal, that a pistol would be carried loaded in a car with the safety off, despite the manufacturer's instructions always to keep the safety on.

■ In this case, the trial court restricted its vision to intended uses and saw the guardrail only as a handrail. The court thus overlooked the possibility that the guardrail would have other foreseeable uses. We believe that the evidence raises a jury question whether a guardrail on an offshore oil platform would foreseeably be used as a support for a scaffold.

The guardrail was not a flimsy apparatus. Rather, it was a heavy steel pipe about two inches in diameter and six feet in length. The pipe was welded to steel I-beams that structurally support the rig. When welded properly, the pipe should bear, according to plaintiffs' expert, 40,000 pounds. The weight of the scaffold and the painters was

4. The district court also concluded that Chevron was not negligent in failing to repair the guardrail since it was adequate for its intended purpose. Finally, the district court concluded that the plaintiffs were contributorily negligent in using the guardrail for the purpose of hanging a scaffold. We address these consequences of the district court's view of the guardrail later in this opinion.

approximately 750 pounds. The scaffold fell only because the welds at both ends of the pipe were corroded and had lost their strength. Whether it was foreseeable and normal that workmen would choose to wrap steel cable around the easily accessible and overtly solid and strong guardrail to support a scaffold raised a question for the jury.

Chevron relies on a line of cases holding that handrails on apartment buildings are not defective if they give away under unexpected stress. See, e.g., Glain v. Sparandeo, 119 La. 339, 44 So. 120 (1906) (a tenant used a railing for support for lowering furniture); Brown v. Pons, 147 So.2d 560 (La. App.1933) (a railing was subjected to unforeseeable stress). These railing cases all have to do with apartment buildings. They have little application to the realities of an offshore oil rig on which workmen are expected to paint from scaffolds. It may not be foreseeable that a thin railing on a roof or balcony will be used as an anchor for a block and tackle to lower furniture to the ground. An oil rig's two inch iron pipe which may be able to support 40,000 pounds when properly welded, however, is an entirely different matter. A reasonable jury could have believed that the guardrail on Chevron's platform offered a convenient and commonly-used support for hanging a painting scaffold. The jury also could have found that such use was foreseeable. The trial court's conclusion that the guardrail could not serve as a scaffold support rests on an overly-restrictive view of "normal use" and on the resolution of fact questions belonging to the jury. It cannot stand.[5]

### B.

The plaintiffs presented evidence to support a theory of negligence under Article 2315 on the part of Chevron. In the plain-tiffs' view, Chevron failed to inspect and maintain the guardrails' welds, which had been weakened by rust. By neglecting to repair the guardrail and by failing to prevent the plaintiffs from hanging the scaffold from the weakened guardrail, Chevron allegedly committed negligence which caused the plaintiffs' injuries. The plaintiffs also put on evidence that Chevron was negligent in failing to halt the plaintiffs' work even though Chevron knew that the plaintiffs were not using proper safety equipment.

The district court denied the negligence claims partially on reasoning which we have rejected above in considering the plaintiffs' strict liability claims. The court found that Chevron had no duty to maintain the guardrail for any purpose other than to serve as a handrail. Chevron's omission to check the welds and to renew them periodically thus did not amount to negligence in the court's view. We have concluded above that the jury could have found that the use of the guardrail as an anchor for the scaffold was a normal and foreseeable use. Accordingly, we cannot uphold a directed verdict on the negligence count premised on the court's finding that Chevron had no duty to maintain the weld in good enough condition to support the scaffold.

The plaintiffs also attack the district court's conclusion that Chevron officials had no knowledge of the method by which the plaintiffs had suspended the scaffold. William McMurrain testified that Chevron was aware that the plaintiffs had hung the scaffold from a guardrail and were not using safety equipment. McMurrain testified that a Chevron supervisor, Mr. Collier, visited the platform and that Collier said that

---

5. Chevron's reliance on Oliver v. Aminoil, supra, is misplaced. In Oliver, a welder fell from a fixed oil drilling platform when a light fixture on which he rested his foot collapsed. The district court held that the oil rig was not in ruin under Article 2322 because the light fixture was not unreasonably dangerous for its purpose, providing light, and we affirmed.

Oliver is distinguishable because the district court there found that the light fixture's purpose did not include use as a footrest. Our affirmance implied only that this finding was not clearly erroneous. Oliver does not compel us to uphold a trial court's refusal to allow a jury to consider whether a heavy iron rail that serves as a guardrail may also foreseeably and normally be used as support for a scaffold.

the manner in which the scaffold was rigged was "okay." Collier testified that he did not remember the conversation. The district court nevertheless concluded that Chevron had no actual knowledge of the manner in which the plaintiffs were performing their work.

The factual finding the district court made as to Chevron's knowledge goes beyond the scope allowed to a district court under *Boeing*. We cannot dismiss McMurrain's words as "completely self-serving testimony, unsupported by other evidence and in the teeth of universal experience . . . ." *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 728–29 (5th Cir. 1977). Rather, the jury was entitled to decide McMurrain's credibility. The trial court acknowledged that "Chevron would have been obliged to insure that [plaintiffs] used their safety equipment if Chevron had been aware of their failure to do so." McMurrain testified that his conversation with Collier took place while Branch and Marlowe were working on the scaffold without safety equipment. If the jury believed McMurrain's testimony, it could have reasonably concluded that Collier knew both the scaffold was anchored to the guardrail and that the plaintiffs were not using proper safety equipment. Thus, a directed verdict on the negligence issue was improper.

### C.

█ The district court ruled, in the alternative, that both the negligence and the strict liability claims were barred because of the plaintiffs' contributory negligence. We conclude that the district court erred in directing a verdict on this basis.[6] The evidence of contributory negligence was not so clear as to persuade us that a directed verdict was proper under *Boeing*.

The district court found two specific acts of contributory negligence. First, the district court believed that the plaintiffs'

choice to suspend the scaffold from the guardrail was a misuse of the guardrail that amounted to contributory negligence. We have considered and rejected the argument that a verdict was properly directed on this basis when we reviewed the strict liability and negligence claims. It suffices to say here that this issue is one for the jury and should not have been resolved on a motion for a directed verdict.

The court made a second finding of contributory negligence. The court held that Branch and Marlowe failed to use available safety equipment. The equipment consisted of safety harnesses to break a possible fall and a safety net designed to be strung beneath the work area. We believe that the court's conclusions on the availability of these pieces of safety equipment go beyond the latitude given by *Boeing*.

The evidence on the availability of safety harnesses was conflicting. McMurrain, who was on the rig and working with Branch and Marlowe, testified that he never saw more than a piece of a harness on the rig. Others, including McMurrain's employer, testified that harnesses were available. Chevron also introduced pictures of safety harnesses aboard the rig and presented testimony that nothing had been moved on the rig between the time of the accident and the time when the pictures were taken.

This conflict in the evidence precludes a finding that safety harnesses were available. McMurrain's testimony, if believed, is sufficient to persuade a reasonable jury that safety harnesses simply were not available. A jury would not be required to accept defendant's contention that the harnesses were placed as pictured on the day of the accident, nor need a jury have accepted the testimony of McMurrain's employer. We cannot say that "the facts and inferences point so strongly and overwhelmingly" in favor of Chevron, *Boeing*, 411 F.2d at 374,

---

6. The plaintiffs have argued that contributory negligence is not a defense to a strict liability claim in the circumstances of this case. *See Rodrigue v. Dixilyn Corp.*, 620 F.2d 537 (5th Cir. 1980). This issue presents a difficult and unsettled question of Louisiana law, *see Dorry*

*v. LaFleur*, 399 So.2d 559 (La.1981) (plurality opinion stating that contributory negligence may bar a strict liability claim in some circumstances), which we need not and do not address on this appeal.

that a directed verdict based upon these factual assertions can be sustained.

The evidence on the feasibility of using safety nets also created a jury question. An official of Platform Coating, the employer of Branch, Marlowe, and McMurrain, testified that he would have required the painters to wear safety harnesses had he known that Branch and Marlowe were not using them, but expressed reluctance to require them to use safety nets. Because of the layout of the rig, nets could only have been attached to conductors—thirty inch pipes located four feet apart. A Platform Coating official stated that "it would be pretty—real hard to hang nets, safety nets in that area." The official's hesitancy to state that he would insist on the use of the nets, coupled with his description of the difficulty of rigging them, raised a question for the jury on whether the plaintiffs could be found contributorily negligent for failing to use safety nets.

## D.

 The district court directed a verdict against McMurrain, the rescuer. The court reasoned that if Chevron was not at fault in the collapse of the guardrail, it could not be held liable for the injuries suffered by the rescuer. Because we reverse the directed verdict in Chevron's favor on the issue of Chevron's liability for the collapse of the guardrail, we also reverse the dismissal of McMurrain's claim as one whose injuries were proximately caused events for which Chevron is legally liable. We intimate no opinion whether McMurrain has shown proximate cause on this record.

### Conclusion

"Motions for directed verdicts have a high mortality rate in this Circuit." *Hagan v. EZ Mfg. Co.*, 674 F.2d 1047 (5th Cir. 1982). The district court in this case directed verdict against the plaintiffs only after making a careful and reasoned analysis of the evidence. The district court does have an obligation to make an analysis of the evidence when ruling on directed verdict motions. But in this case the district

court's conclusions involved substantial weighing of conflicting evidence which is not appropriate when granting a directed verdict. After reviewing the record, we conclude that the plaintiffs presented sufficient evidence to go to the jury. Accordingly, the case must be remanded for a jury trial.

REVERSED AND REMANDED.