**Robert L. DUTSCHKE and Gem Underwriters Incorporated**

v.

**PIPER AIRCRAFT CORPORATION.**

**Civ. A. 80–690–B.**

United States District Court,
M.D. Louisiana.

June 1, 1983.

Tony B. Jobe, C. James Gelpi, James F. Willeford, New Orleans, La., for plaintiffs.

Donald O. Collins, Warren M. Schultz, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant.

POLOZOLA, District Judge:

This diversity action was filed by the plaintiffs against the Piper Aircraft Corporation (Piper) to recover damages allegedly resulting from a series of nose gear failures on a private plane owned by the plaintiff, Robert L. Dutschke and leased to his corporation, Gem Underwriters, Inc. Also joined as a plaintiff is United States Fire Insurance Company, which paid for property damage to the plane which was caused by the nose gear failures.

The private plane involved in this case was constructed by a private individual from two other planes which had originally been manufactured by Piper and had been involved in separate plane crashes. Plaintiffs contend that they are entitled to recover from Piper on two grounds: (1) Piper was responsible for the entire defective nose gear assembly; and, (2) the nose gear downlock was improperly and defectively manufactured by Piper. Piper denies any liability to the plaintiffs. For reasons which follow, the Court finds that Piper has

no liability to the plaintiffs in this case. Therefore, plaintiffs' suit must be dismissed with prejudice.

In 1978, Dutschke purchased a single-engine, retractable-gear aircraft from Ty Cobb, d/b/a Ty Cobb Aviation, in Baton Rouge. The plane was represented to be a 1977 Piper Cherokee Lance bearing Piper serial number 32R–7780034 and FAA registration number N6638F. During the period that Dutschke owned the plane, from 1978 to 1980, he experienced four nose gear collapses. The last three of these collapses form the basis of this suit.

The evidence presented at the trial revealed that the plane which Dutschke purchased had a long and interesting history. The 1977 Piper Lance bearing serial number 32R–7780034 and FAA registration number N6638F was sold, through a Piper distributor, to Vagabond Aviation of Olympia, Washington. On January 27, 1977, the plane was almost totally destroyed in a crash in the State of Washington. The extent of the damage to the aircraft from this accident is shown on Defendant's Exhibit No. 5. The plane was subsequently deregistered by the FAA. The wreckage was ultimately sold as scrap to John Marrs in Lake Placid, Florida.

Marrs also acquired the scrap from a 1976 Piper Lance bearing serial number 32R–7680237 which had also crashed. This plane had been sold by Piper to the Piper engineering department for experimental flight testing of a new "T-tail" design. The plane was issued a special airworthiness certificate from the FAA and designated as an experimental aircraft. The standard tail was removed and a new "T-tail" was installed on this experimental aircraft.

During a flight test, the plane crashed, resulting in serious damage to the landing gear and wing skin. John Marrs and John Evans, a Piper/FAA coordinator, testified that the nose gear was ripped off the plane. After the crash, the "T-tail" was removed from the plane, and the remainder of the plane was sold as scrap to Joe Marrs, John Marrs' father. The data plate from the plane, containing its serial number and other information was destroyed.

Vincent Tennant, a Piper representative at trial, testified that when Piper sells "scrap", it is useless as an aircraft, although the scrap may be used for parts or for scrap metal.

Using principally the wreckage from the 1976 experimental plane, John Marrs constructed the plane which was ultimately sold to Dutschke. John Marrs also used parts from the plane which had crashed in Washington and from other Piper aircraft. Marrs may have also made some of the parts for the plane. The aircraft data plate from the Washington plane was placed on the newly constructed plane by John Marrs thereby indicating that the "new plane" was the Washington plane which had been "repaired".

It is clear that Piper was not involved in any way with the construction of the "new plane" from the two crashed planes. The reconstructed plane changed hands several times until it was ultimately purchased by Dutschke. Piper was not a party to this sale.

The main problem with the plane which the plaintiff bought from Marrs pertained to the front nose gear. Therefore, the Court believes it would be helpful to describe the function of the retractable nose gear on a Piper Lance with the understanding that Piper was not a participant in the reconstruction of the plane which plaintiff bought. When fully extended, the nose gear is held in position, slightly forward of vertical, by the "drag links". The drag links, which are pictured as Part # 7 in Exhibit PX–1, are two solid, V-shaped pieces of metal positioned somewhat horizontally and hinged together at the points of the "V's". The open end of the forward drag link is bolted on either side of the wheel strut and the open end of the rear drag link is bolted to the frame of the aircraft. The drag links are hinged in such a way that, when they reach a point in

rotation slightly over center in a downward direction, they butt ends and can rotate no farther. This is the "down and locked" position of the nose gear. In this position, the plane is supported by the pressure of the drag links against themselves.

The gear is initially forced down by either hydraulic pressure or gravity. The drag links are then held in the down and locked position by gravity, or the weight of the plane, springs and, in part, by a part designated as the downlock. When the gear is retracted, the drag links fold back over center in an upward direction, bringing the nose wheel up into the body of the plane. When the gear is in the down and locked position, the downlock, located at the aft end of the rear drag link, surrounds, but does not actually contact, a metal pin on the engine mount of the plane. The downlock is designed to serve two primary functions. First, it contacts a microswitch which activates the "down and locked" indicator light in the cockpit and turns off the hydraulic system which pumps the gear down if, due to wind conditions, it does not free-fall. Second, the downlock is designed to prevent the drag links from going back over center when the gear hits a rough spot in the runway and keeps the gear from bouncing back over center and collapsing. It is clear that the downlock is not designed to support the weight of the plane. Only the drag links are strong enough to actually support the plane. In short, the Court finds that the breakage of the downlock was a result, but not a cause of the nose gear failure.

■ In this diversity case the Court must and does apply Louisiana law. To recover in a product liability action under Louisiana law, the plaintiffs must show that a product manufactured by the defendant was defective in design, composition, or manufacture, it was unreasonably dangerous to normal use, and the defective condition of the product caused the damage. *Thornhill v. Black, Sivalls & Bryson, Inc.,* 394 So.2d 1189 (La. 1981), citing *Weber v. Fidelity & Casualty*

*Ins. Co. of N.Y.,* 259 La. 599, 250 So.2d 754 (1971); see also *Brown v. Link Belt Division of FMC Corp.,* 666 F.2d 110 (5th Cir.1982), citing *Hill v. City Stores, Inc.,* 387 So.2d 585 (La.1980).

■ The Court finds that the plaintiffs have failed to prove that Piper manufactured the nose gear assembly on the reconstructed plane. Piper parts may have been used by John Marrs. However, these parts came from planes which suffered substantial damage in airplane crashes. There is not a scintilla of evidence which shows that Piper participated in the reconstruction of plaintiff's plane or that the reconstruction was performed in accordance with standards and procedures of the Piper Aircraft Corporation. Furthermore, it is clear that the parts of the crashed planes which were used on the reconstructed plane were not in the same condition as the parts were when they were installed on the original two planes prior to the crashes. These findings are fully supported by the evidence presented at the trial. Stuart Fillinger, the son of the present owner of the plane and a certified mechanic for Piper Aircraft, testified that he found several damaged parts in the nose gear assembly. He also found that the engine mount, to which the nose gear is attached, was not properly aligned. Fillinger stated that the damage he found on the parts occurred over some length of time and not since the last gear failure. It is probable that the worn parts and the misalignment prevented the nose gear from free-falling into the down position. Fillinger also testified that the misalignment of the downlock would have signaled a green light in the cockpit indicating the nose gear was in the down position when in fact it was not actually down and locked. Since the same switch deactivates the hydraulic system, this system would not complete the lowering of the gear and a nose gear failure could occur. The plaintiff has failed to prove that this condition existed at the time the original plane left the Piper factory and was caused by a design or manufacturing

defect for which Piper is responsible. The evidence does reveal that the misalignment was probably caused by John Marrs when he remanufactured the plane. To hold that a manufacturer of two planes which crashed, were decertified by a government agency and were sold as scrap is liable to a plaintiff who purchased a plane built from the scrap is simply extending products liability law and responsibility too far. This is particularly so in this case when the evidence reveals that the problems with the nose gear resulted from the manner in which the gear was repaired and installed by John Marrs and not from its condition when it originally left the Piper factory.

Plaintiff seeks to show that Piper had knowledge of other nose gear collapses by introducing a computer printout of service problems reported to the FAA by mechanics in the field. The Court gives little, if any, weight to this evidence because the circumstances and the cause of these failures were not shown. Furthermore, these alleged failures were reported on aircraft manufactured by Piper. Plaintiff's aircraft was not manufactured by Piper.

The second contention raised by plaintiffs in support of their claim relates to the strength of the downlock itself. Plaintiffs argue that the downlock is a safety or back-up system to support the gear. The evidence fails to support this contention. It is clear that the downlock was not designed to be a safety or back-up system. The downlock was not made to hold the weight of the aircraft but was designed to keep weight on the drag links. If the drag links, for whatever reason, fail to reach the over-center position, the gear may fail. Piper has designed this system in such a manner that if the gear is not fully engaged, the downlock will not contact the microswitch and the pilot will know that the gear is not down and locked. In this case, because of the misalignment of certain parts by parties other than Piper, the pilot got a green light even though the gear was not fully engaged. When the weight of the plane was

transmitted to the downlock, it broke and the gear collapsed.

This does not mean, however, that the downlock was defective. Here, it was being subjected to pressures outside its normal use. The plaintiff has made no showing that the downlock could not withstand the pressures that were to be placed on it as designed. The downlock's failure to support the nose, a function it was clearly not designed to perform, does not render the part defective. If the design was changed by Marrs so that the downlock was a back-up support system for the gear, then such a defect was caused by Marrs' design, not Piper's design as the part left the Piper factory.

The Court is aware that the Fifth Circuit has recently held that " '[n]ormal use is a matter of foreseeable use . . .' " *Branch v. Chevron International Oil Co., Inc.,* 681 F.2d 426 (5th Cir.1982), quoting *Cobb v. Insured Lloyds,* 387 So.2d 13, 18 (La.App. 3rd Cir. 1980). Of course, "foreseeable" is no more a definite term than "normal", though it does carry a different connotation. In this case, it suffices to say that Piper cannot be held liable for the failure of its part when the part is put to a use outside its designed capabilities, particularly where the part is used in a plane constructed of scrap parts of two aircrafts which had crashed. See *Walter v. Valley,* 363 So.2d 1266 (La.App. 4th Cir.1978); and *Bakunas v. Life Pack, Inc.,* 531 F.Supp. 89 (E.D.La.1982) in which no design defect was found by the Court although the defendants' products failed under arguably foreseeable, though unintended, uses of the products. See, also: *St. Pierre v. Gabel,* 351 So.2d 821 (La.App. 1st Cir.1977) and *Williams v. Louisiana Machinery Co., Inc.,* 387 So.2d 8 (La.App. 3rd Cir. 1980), in which the use of improper replacement parts precluded a finding of liability. Furthermore, the Court finds that it was unforeseeable that the replacement downlocks manufactured by Piper would be used as a back-up support system for the nose gear. And, inasmuch as the parts were sold to licensed aircraft repair facilities, the Court finds under the facts of this case that

Piper had no duty to warn purchasers of the obvious fact that these parts should not be used on an improperly manufactured nose gear.

The final issue the Court must determine is the objection the defendant has made to certain portions of the depositions of John Ward Evans and Glen L. Hessler. The plaintiffs have not responded to these objections. The Court finds that defendant's objection to the following sections of the depositions is hereby sustained and these portions of the depositions have not been considered by the Court:

Deposition of John Ward Evans:

Page 13, line 15 through page 24, line 20

Page 27, line 5 through page 28, line 4

Page 28, line 15 through page 36, line 14

Page 40, line 8 through page 40, line 19

Page 41, line 4 through page 42, line 2

Page 49, line 5 through page 49, line 15

Page 50, line 14 through page 51, line 3

Page 52, line 4 through page 52, line 19

Page 75, line 21 through page 76, line 6

Deposition of Glen L. Hessler:

Page 46, line 19 through page 51, line 15

The remaining objections urged by the defendant to these depositions are hereby overruled.

Thus, in summary, the Court finds that Piper has no liability in this case. Therefore, plaintiffs' suit is hereby dismissed with prejudice.

Judgment shall be entered accordingly.